**REVISED**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 96-20350

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

VERSUS

JOSHUA MAZIQUE BURTON; QUINTON B. CARR

Defendants - Appellants.

Appeals from the United States District Court
For the Southern District of Texas
October 17, 1997

Before DUHÉ and BARKSDALE, Circuit Judges, and COBB, District Judge.[1]

JOHN M. DUHÉ, JR., Circuit Judge:

Appellants Joshua Burton and Quinton Carr were convicted and sentenced for conspiracy to commit robbery, in violation of 18 U.S.C. § 371 ("conspiracy"), and for attempted robbery by force, violence and intimidation, in violation of 18 U.S.C. §§ 2113(a) and 2 ("bank robbery").  On appeal, Appellants contend the Government's evidence was insufficient to convict them of either offense and that the district court erred in adding a six-level increase to

_____

[1]District Judge of the Eastern District of Texas, sitting by designation.

their offense levels for "otherwise using a firearm."  We affirm.

## BACKGROUND

On December 21, 1994, two armed men attempted to rob Bank One in Missouri City, Texas at around 2:30 p.m.  The men were dressed in grey sweat suits and wore black masks.  They pointed guns at the bank employees and threatened to kill the employees if they did not cooperate.  After unsuccessfully attempting to enter the bank vault, the men abandoned their robbery attempt.  Before leaving, the robbers threatened to blow up the bank and left two small packages they removed from a black duffel bag.  The packages were actually shoe boxes containing road flares, wires and an alarm clock and could not be detonated.  The only description of the robbers the bank employees could provide was that the skin around their eyes not covered by the masks revealed the men were African-American.

A witness using the ATM outside the bank saw two men in grey sweat suits run out of the bank carrying a black duffel bag, enter a parked blue car, and drive away, apparently driven by a third man.  Policemen soon arrived and found the car abandoned, with the motor running, at a nearby car wash.  The car was later determined to belong to Quinton Carr ("Carr").  Around midnight on December 22, the morning after the robbery attempt, Carr called the police and reported the car stolen.

The Government alleged that Joshua Burton ("Joshua") and his cousin, Wilton Burton ("Wilton"), actually entered the bank, and that Carr (Joshua's cousin and Wilton's brother) allowed his car to

2

be used for the getaway and also picked up Joshua and Wilton after the robbery. Wilton gave a statement to police apparently implicating Joshua and Quinton in the robbery, but recanted that statement at trial, claiming he had confessed only because policemen were beating him. After a trial in which the Government relied largely on circumstantial evidence, Appellants were convicted on both counts.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

In reviewing the sufficiency of the evidence, we view the evidence and all inferences to be drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Broussard, 80 F.3d 1025, 1030 (5th Cir.), cert. denied, 117 S.Ct. 264 (1996). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." United States v. Bermea, 30 F.3d 1539, 1551 (5th Cir. 1994). The standard of review is the same regardless whether the evidence is direct or circumstantial. United States v. Cardenas, 9 F.3d 1139, 1156 (5th Cir. 1993).

To establish a conspiracy under 18 U.S.C. § 371, the Government must prove (1) an agreement between two or more persons, (2) to commit a crime, and (3) an overt act committed by one of the conspirators in furtherance of the agreement. United States v.

3

<u>Gray</u>, 96 F.3d 769, 772-73 (5th Cir. 1996), <u>cert. denied</u>, 117 S.Ct. 1275 (1997).  The conspiracy need not be proved by direct evidence, but agreement may be inferred from circumstantial evidence, such as concert of action.  <u>United States v. Schmick</u>, 904 F.2d 936, 941 (5th Cir. 1990).  "When the [G]overnment attempts to prove the existence of a conspiracy by circumstantial evidence, each link in the inferential chain must be clearly proven."  <u>United States v. Galvan</u>, 693 F.2d 417, 419 (5th Cir. 1982).  Proof of "mere association" with persons involved in criminal activity is insufficient, by itself, to establish participation in a conspiracy.  <u>Id</u>. at 420.  Likewise, familial relationships alone will not support a conspiracy conviction; "[i]nferences drawn from familial relationships or mere knowing presence, however, may be combined with other circumstantial evidence to support a conspiracy conviction."  <u>Broussard</u>, 80 F.3d at 1031, <u>citing</u>  <u>United States v. Williams-Hendricks</u>, 805 F.2d 496, 503 (5th Cir. 1986).

To convict of bank robbery under 18 U.S.C. § 2113(a), the Government must prove (1) an individual or individuals (2) used force and violence or intimidation (3) to take or attempt to take (4) from the person or presence of another (5) money, property or anything of value, (6) belonging to or in the care, custody, control, management, or possession (7) of a bank, credit union, or savings and loan association.  <u>United States v. McCarty</u>, 36 F.3d 1349, 1357 (5th Cir. 1994).

A person who aids or abets the commission of a crime is punishable as a principal.  18 U.S.C. § 2.  To prove aiding and

4

abetting, the Government must show that the defendant (1) associated with the criminal venture; (2) participated in the venture; and (3) sought by action to make the venture succeed. United States v. Salazar, 66 F.3d 723, 729 (5th Cir. 1995).

*A.  Joshua Burton*

1.  Testimony of Wilton Burton

Wilton Burton made a videotaped statement to the police in which he apparently implicated the Appellants in the planning and commission of the bank robbery. He testified for the Government under a grant of both state and federal immunity. At trial, however, Wilton recanted his earlier statement, claiming that he had made it only because the police were beating and kicking him. The court allowed a portion of his videotaped statement to be played before the jury, but only for the purpose of impeachment, to demonstrate Wilton's demeanor during the taping. The substance of most of Wilton's statement is not of record; the Government may thus not rely on it as evidence of Joshua Burton's guilt.[2] The Government did try, however, to elicit from Wilton on direct examination what he told the police.

At trial, Wilton categorically denied any involvement in or

---

[2]In its brief, the Government recites at length facts allegedly from Wilton Burton's statement to investigating officers. We cannot understand, however, how the Government hopes to rely on this "evidence" as supporting Joshua Burton's convictions: Wilton Burton's statement to the officers is simply not of record. We also note that the Assistant United States Attorney in this case improperly referred to the substance of Wilton's statement in his closing argument and even invited the jury to consider "parts of what he said happened that day and recanted." Such comments were improper, but, as Appellants did not raise them as error on appeal, we also do not address them.

knowledge of the attempted robbery.[3] He did admit on direct examination, however, to having made certain admissions to agents during questioning:

> Q: You told [F.B.I. agent Johnson] you were one of the men that walked into the bank?
>
> A: Yes.
>
> &ast; &ast; &ast;
>
> Q: You said Joshua [Burton] was the other man in these photographs you looked at? (referring to photographs of the robbers taken by bank cameras)
>
> A: Yes.

Wilton also admitted to telling police that Carr picked him up at his cousin Christopher Spooner's house early on the morning of the robbery and that they went to see their cousin, Craig Burton;[4] that Wilton, Joshua, Carr, Spooner, and Craig Burton had robbed the bank; and, that he and Joshua had gone to rob the bank in Carr's automobile. Of course, Wilton denied that these statements were true; he admitted only that he had made them, but while under duress.

### 2. Asia Morgan's Testimony

The court admitted against Joshua Burton the testimony of Asia Morgan regarding one conversation she overheard between her husband, Christopher Spooner, and Wilton Burton and another she

---

[3]The Government later established that Wilton Burton's fingerprint was found on one of the fake bomb shoeboxes recovered from the scene of the robbery.

[4]Craig Burton is yet another relative of Appellants and was indicted for the same crimes. At the close of the Government's case, however, the court granted Craig Burton's motion for judgment of acquittal.

6

herself had with Wilton. Christopher Spooner is Wilton Burton's cousin; Wilton regularly spent the night at Asia and Christopher's apartment.

On appeal, Joshua Burton contends the court erred in admitting Asia's testimony because it was hearsay and did not fall within the "co-conspirator" exception of Federal Rule of Evidence 801(d)(2)(E).[5] Before admitting a co-conspirator's statement under this Rule, the court must determine by a preponderance of the evidence (1) that there was a conspiracy involving the declarant and the non-offering party, and (2) that the statement was made "during the course and in furtherance of the conspiracy." United States v. Bourjaily, 483 U.S. 171, 175 (1987); United States v. McConnell, 988 F.2d 530, 533 (5th Cir. 1993). In making that determination, the court may consider the hearsay statements sought to be admitted. Bourjaily, 483 U.S. at 181. Joshua argues that there was insufficient evidence to find he was a member of the conspiracy. He also maintains, in any case, that the statements testified to by Asia Morgan were not "in furtherance of" the conspiracy.

The court found, by a preponderance of the evidence, that Joshua was a member of a conspiracy including Wilton Burton and Quinton Carr. The court made no finding, however, whether the statements Asia testified to were "in furtherance of" the

---

[5]"A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

conspiracy.

We must first address whether Joshua Burton adequately raised these issues in the district court. An appellant must raise an objection to the admission of evidence at trial such that the issue is presented to the district court "with sufficient specificity." United States v. Maldonado, 42 F.3d 906, 910 (5th Cir. 1995). A sufficiently specific objection is necessary at trial so that "testimony could have been taken, and argument received, on that issue; and [so that] the district court would have dealt with it." Maldonado, 42 F.3d at 912. If the issue was not adequately raised at trial, we review only for plain error. United States v. Calverley, 37 F.3d 160, 162 (5th Cir. 1994) (en banc).

Near the beginning of Asia Morgan's direct examination, the Government asked her whether she had ever heard Wilton Burton speak to her husband "about planning a bank robbery." At that point, counsel for Craig Burton and Joshua Burton made the following objections:

> MR. WILSON: Your Honor, I'd object to any references to my client Craig Burton *under 801.d2e.*

> MS. KAPUNGU: The same would apply to Joshua Burton.

(emphasis added). The court did not immediately rule on those objections; instead, it instructed the Government to "ask the question" again. The Government's questions immediately subsequent to those objections did not raise any hearsay matters and so there were no further objections.

Soon after that exchange, there was a bench conference in which the AUSA indicated that the Government intended to introduce

8

testimony by Asia regarding a conversation she had had with Wilton Burton that alluded to the bank robbery and implicated Joshua. The court then questioned the AUSA as to what evidence the Government had linking Joshua to the conspiracy involving Wilton Burton and Quinton Carr.[6] When the AUSA informed the court that it intended to introduce the testimony of F.B.I. Agent Eric Johnson (see discussion infra Part I.A.4) that would link Joshua to the conspiracy, the court made the following finding:

> Subject to that evidence coming in and then conditioned upon [its] admissibility, I am going to I conclude [sic] that Joshua was a member of this same conspiracy that I earlier found by a preponderance of the evidence existed between Wilton Clyde Burton Junior and Quinton Carr.

During this colloquy, counsel for Joshua Burton raised only the sufficiency of the Government's evidence linking Joshua to the conspiracy. The "in furtherance" requirement of 801(d)(2)(E) was not mentioned and the court made no findings on that point.

On this record, we find that Joshua Burton's counsel adequately objected to Morgan's testimony on the ground that sufficient evidence had not been adduced to link Joshua to the conspiracy. The issue whether the statements to which Asia Morgan testified were "in furtherance of" the conspiracy, however, was not specifically raised. On appeal, Joshua Burton relies on his counsel's objection to Asia Morgan's testimony "under 801.d2e"; indeed, in his brief Joshua Burton claims that "[h]is objection

---

[6]The court had previously found, by a preponderance of the evidence, that a conspiracy existed between Wilton Burton and Quinton Carr.

9

could not have been more precise."  In this particular context, however, that is not the case.

In Maldonado, the issue was whether defense counsel objected with sufficient specificity that a police officer's Terry stop and patdown search of defendant contravened the Supreme Court's (then) recent decision in Minnesota v. Dickerson, 508 U.S. 366 (1993).[7] During the patdown, the officer discovered a bulge in defendant's boot, reached in and withdrew a rounded, duct-taped package and opened it;  the package contained heroin.  Counsel objected that the officer had no "probable cause" to open the package, but did not cite Dickerson to the court, even though Dickerson had been decided three and one-half months before defendant's motion to suppress was filed.  We determined that the Dickerson issue had not been adequately raised at trial and therefore reviewed for plain error.  Maldonado, 42 F.3d at 912.

Joshua Burton argues that Maldonado resolves the question in his favor:  counsel in Maldonado did not cite Dickerson to the district court and therefore forfeited the error based on Dickerson (i.e., that the officer's "plain feel" seizure of the heroin violated Terry because it should have been immediately apparent to the officer that the package was not a weapon);  by contrast, Joshua's trial counsel cited the specific rule and subsection of

---

[7]Dickerson held that an officer may lawfully seize contraband during a Terry search only if the search remains within the bounds of Terry (i.e., the officer is investigating an object that may reasonably be a weapon) and the object's identity as contraband is "immediately apparent."  See Maldonado, 42 F.3d at 909, citing Dickerson, 508 U.S. at 375;  see also Terry v. Ohio, 392 U.S. 1, 26 (1968).

10

the Federal Rules of Evidence on which her objection was based. Therefore, Joshua argues, her objection was sufficiently specific to bring *any* issue under 801(d)(2)(E) before the district court. Joshua, however, exaggerates the "specificity" of trial counsel's objection and misapprehends the thrust of Maldonado.

Under Maldonado, a determination whether an objection was made with "sufficient specificity" does not hinge on whether counsel cited a specific case or article in her objection. Instead, the touchstone is whether the objection was specific enough to allow the trial court to take testimony, receive argument, or otherwise explore the issue raised. Maldonado, 42 F.3d at 912.[8] Certainly, citing a specific case or article to the court could shed more light on the substance of an objection. On this record, however, more was necessary to bring the "in furtherance" issue before the district court.

First, Rule 801(d)(2)(E) contains at least four possible bases for an objection to proffered co-conspirators' testimony: that the declarant was not a co-conspirator; that the party against whom the

---

[8]In Maldonado we did indicate that a specific citation to Dickerson would probably have been sufficient to bring the issue before the district court. Maldonado, 42 F.3d at 910 ("At no stage of the suppression process was Dickerson ever cited to the district court . . ."). That was true in Maldonado, not because citing a case or rule magically presents a particular issue to the court, but because in the precise context of Maldonado (an evidentiary suppression hearing regarding the propriety of a Terry patdown), a citation to Dickerson would have been sufficiently specific. In the instant matter, by contrast, a bare-bones citation to rule 801(d)(2)(E) was not sufficient to bring the "in furtherance" issue clearly before the district court; the discussion of court and counsel subsequent to that objection, in which no mention was made of the "in furtherance" issue, shows this to be true.

statement is offered was not a co-conspirator; that the statement was not made "in the course" of the conspiracy; that the statement was not made "in furtherance of" the conspiracy. See McConnell, 988 F.2d at 533. A court could entertain an objection to a co-conspirator's statement under any of these distinct bases; the objection would still, however, be "under 801(d)(2)(E)." See, e.g., McConnell, 988 F.2d at 534.

Second, the fact that the party offering the co-conspirator's statement has the burden of establishing that the statement falls within 801(d)(2)(E), see United States v. Triplett, 922 F.2d 1174, 1181 (5th Cir. 1991), has no bearing on whether an adequate objection was raised to the proffered evidence. Whether the offering party carried its burden or not, if the objecting party wants to avoid forfeiting its error on appeal it must object with "sufficient specificity" to allow the trial court to address the issue. Maldonado, 42 F.3d at 910, 912.

Third, and most importantly, the thrust of the objections here was whether sufficient evidence linked Joshua to the conspiracy and not whether the statements were "in furtherance of" the conspiracy. See Maldonado, 42 F.3d at 911 ("Argument presented at the hearing by Maldonado's lawyer after the testimony further indicates he was concerned only with post-removal probable cause."). During the bench conference at which the propriety of Asia Morgan's testimony was before the court, the "in furtherance" requirement was not

mentioned.[9]

In sum, then, the objection that the statements to which Asia testified were not "in furtherance of" the conspiracy was not adequately raised. We therefore review that point for plain error. Calverley, 37 F.3d at 162; Fed. R. Crim. P. 52(b). On the other hand, the ground that the Government had not adduced sufficient evidence linking Joshua Burton to the conspiracy was adequately raised. We will thus review the district court's finding on that point for clear error. United States v. Hawkins, 661 F.2d 436, 450 (5th Cir. 1981).

We first deal with the district court's finding that the Government proved that Joshua Burton was a member of the conspiracy. The Government called F.B.I. Agent Eric Johnson, who testified that he found receipts for clothing and a duffel bag in a room that Joshua had recently vacated.[10] Other witnesses identified the objects corresponding to the bar codes on those receipts (grey sweat clothes and a black duffel bag) as "similar" to those used in the robbery.[11] The Government also introduced the

---

[9]Additionally, the "801(d)(2)(E)" objection came well before that bench conference, and in the context of a different conversation overheard by Asia between her husband and Wilton Burton.

[10]Agent Johnson also testified that he found letters in the room from Joshua to his girlfriend LeJuangela Jones, thus tying the objects found in the room to Joshua.

[11]The actual clothes worn and the duffel bag used in the robbery were not recovered by the Government. Contrary to what the Government asserted in its brief, witnesses at trial were shown items that corresponded to the bar codes on receipts found in Joshua's former room, and not the actual items.

13

testimony of Ed Burton, the Appellants' uncle, that while he was working in the vicinity of the bank on the morning of the robbery he thought he saw Joshua Burton driving around in Quentin Carr's blue Pontiac (the car that was later found abandoned at the car wash and identified as the one used in the robbery). Finally, the court could have relied on Wilton Burton's testimony that he told police he and Joshua were the men appearing in the bank photos of the robbery.

Given this evidence, we cannot say the district court's determination that Joshua was a member of the conspiracy was clearly erroneous.

We next turn to the question whether admission of Asia Morgan's testimony constituted "plain error" because the statements to which she testified were not "in furtherance" of the conspiracy between Joshua Burton, Wilton Burton and Quinton Carr. Fed. R. Crim. P. 52(b); Fed. R. Evid. 801(d)(2)(E). We conclude that allowing her testimony did not constitute "plain error" in that the error, if any, was not "plain" under current law.

We follow a four step analysis for "plain error" review: (1) there must be an "error," i.e., a "deviation from a legal rule," that has not been waived; (2) the error must be "plain," i.e., "clear" or "obvious" under current law; (3) the error must "affect substantial rights," i.e., it must have affected the outcome of the proceeding; and, (4) even if the error was "plain" and "affected substantial rights," the Court of Appeals, exercising its discretion, should correct the error only if the error "seriously

14

affect[s] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732-737 (1993); United States v. Calverley, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc).

Since we resolve the question by reference to the second Olano factor (i.e., that the error here was not "plain"), we assume without deciding that the district court's decision to admit Asia Morgan's testimony was error.[12] By "plain," the United States Supreme Court means "clear" or "obvious" under current law. Olano, 507 U.S. at 734; Calverley, 37 F.3d at 162-164. Thus, we must examine, first, what Asia Morgan testified to, and, second, determine whether under current law it is "clear" or "obvious" that such a statement was not "in furtherance of" the conspiracy under 801(d)(2)(E).

Asia testified that she had a conversation with Wilton Burton sometime before December 21, the day of the robbery. During that conversation, Wilton told her that "it was going to be a nice Christmas." When asked whether Wilton explained to her why it would be a "nice Christmas," Asia testified (after refreshing her recollection from her grand jury testimony): "He [Wilton] said that he and his cousin had planned to rob a bank." Asia explained that Wilton was referring to his cousin "Zeaki"; it had earlier been established that "Zeaki" was Joshua Burton's nickname. See discussion infra Part I.A.3.

---

[12]For purposes of resolving this issue, then, we assume that the statements to which she was allowed to testify were not "in furtherance of" the conspiracy.

15

The requirement that a co-conspirator's statement be "in furtherance of" the conspiracy "is not to be construed too strictly lest the purpose of the exception be defeated." <u>United States v. Broussard</u>, 80 F.3d 1025, 1039 (5th Cir. 1996); <u>United States v. Lechuga</u>, 888 F.2d 1472, 1480 (5th Cir. 1989). We have "shunned an overly literal interpretation of this [phrase]." <u>Broussard</u>, 80 F.3d at 1039, <u>quoting</u> <u>United States v. Ascarrunz</u>, 838 F.2d 759, 763 (5th Cir. 1988). "Mere idle conversation," however, is not considered "in furtherance of" a conspiracy. <u>United States v. Means</u>, 695 F.2d 811, 818 (5th Cir. 1983); <u>United States v. Miller</u>, 664 F.2d 94, 98 (5th Cir. 1981).

We have found the following statements to be "in furtherance of" a conspiracy under 801(d)(2)(E): "a statement that identifies the role of one co-conspirator to another" (<u>United States v. Magee</u>, 821 F.2d 234, 244 (5th Cir. 1987)); statements conveying "information [that] could have been intended to affect future dealings between the parties" (<u>United States v. Patton</u>, 594 F.2d 444, 447 (5th Cir. 1979)); "[p]uffing, boasts, and other conversation . . . when used by the declarant to obtain the confidence of one involved in the conspiracy" (<u>Miller</u>, 664 F.2d at 98); "statements which are puffing or boasts, but which are used to obtain the confidence of the person toward whom the statement is directed" (<u>United States v. Johnson</u>, 872 F.2d 612, 623 (5th Cir. 1989)). <u>See also</u> <u>United States v. Smith</u>, 833 F.2d 213, 219 (10th Cir. 1987) ("[S]tatements that explain events of importance to the conspiracy in order to facilitate its operation are considered to

16

be in furtherance of the conspiracy.").

We cannot, after examining the current law construing the "in furtherance of" requirement of 801(d)(2)(E), say that the error, if any, was "plain." Given the vague nature and context of the comments made to Asia by Wilton Burton, we are not prepared to deem it "plain" under current law that these statements were not "in furtherance of" the conspiracy.

### 3. Testimony of Ed Burton

Ed Burton, both Joshua Burton and Quinton Carr's uncle, testified that on the morning of December 21, while he was on his way to work, he thought he saw his nephew Joshua driving Carr's vehicle[13] in the vicinity of Bank One. Although Ed had not seen Joshua in four or five years, he testified that he would have been able to recognize him.[14] Ed called out to his nephew when he saw him, but received no response.[15]

Ed also testified that later that day, around 3:00 p.m., he saw the same car fleeing the scene of the robbery (he was unable to identify its occupants at that time, however). When shown a picture of the car found abandoned at the car wash, Ed Burton

---

[13]Ed Burton initially testified that the car was "green." Further testimony established that Ed was not particularly "good on colors." He was able to identify the car as the same one depicted in the photos shown to him of the car wash. The jury could have reasonably believed, then, that Ed made a mistake when he originally testified the car was "green" and not "blue."

[14] Ed also testified that Joshua's nickname was "Zeaki."

[15]It bears noting here that Rita Gwen, Carr's girlfriend, testified that Carr picked her up that same morning in a cream-colored Lexus; it was shown that Joshua drove a cream-colored Lexus. See discussion infra Part I.B.3.

identified it as the same car he had seen twice before on the day of the robbery in the vicinity of Bank One.

4.   Clothing and duffel bag receipts.

F.B.I. Agent Eric Johnson testified that on December 23, 1994 he searched a room where Joshua Burton had been staying.[16]  In the room, Agent Johnson found three receipts, one from K-Mart and two from Academy, dated November 30, 1994 (about three weeks before the robbery).

An employee of K-Mart testified that the UPC codes on the K-Mart receipt corresponded to a duffel bag and to a "small, flat hat."  When shown photos from the bank robbery, she also stated that the hats the robbers had pulled down over their faces were similar to the type indicated by the UPC codes on the receipts. Other eye-witnesses to the robbery testified that a duffel bag matching the code on the receipt was similar to the one the robbers were carrying and from which they took the fake bombs.

An employee of Academy testified that the SKU numbers on the Academy receipt corresponded to grey sweat pants, a small sweat shirt, and a large hooded sweat shirt.  Eye-witnesses to the robbery identified clothing corresponding to the SKU numbers on the receipts as similar to clothing worn by the robbers.

_____

[16]Joshua's counsel objected to Agent Johnson's testimony on the basis that it had not been established that the room was Joshua's "residence."  Agent Johnson testified, however, that before searching the room he "conducted several computer checks," consulted with other investigators, was informed by the owners of the house that the room had recently been Joshua's, and, finally and perhaps most importantly, found letters in the room from Joshua to his girlfriend, LeJuangela Jones.

18

### 5. Conclusion

The Government proved that Joshua Burton was seen in the vicinity of the bank on the day of the robbery driving the car that was later used in the robbery. There was also testimony that Quinton Carr was driving Joshua Burton's Lexus around that same time. The Government introduced receipts found where Joshua had recently been living; those receipts corresponded to clothing and items identified by eye-witnesses as similar to the clothing worn by the robbers and a bag used by the robbers to carry fake bombs. There was evidence that Wilton Burton, one of Joshua's co-conspirators, talked about planning the robbery with Joshua. Finally, Wilton admitted at trial that he had told police that he and Joshua were the men in the photos of the robbery taken by bank cameras. Wilton recanted that statement in the same breath, but the jury was entitled to believe *what he admitted at trial* to have been his earlier version. The jury also could have relied, along with the other circumstantial evidence, on Joshua's familial connection with the other participants in the robbery. See Williams-Hendricks, 805 F.2d at 503.

Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that the Government carried its burden of proof as to Joshua Burton.

### B. Quinton Carr

#### 1. The blue Pontiac.

Police found a blue Pontiac abandoned, with its engine still running, in a car wash near the robbery scene. The key was in the

19

ignition and the car showed no signs of having been hot wired. Police found evidence in the car linking it to Quinton Carr, including an automobile service contract in Carr's name, Carr's medical card, and cards written to Carr by his girlfriend Rita Gwen. Ed Burton testified that he saw the car in the vicinity of the bank both on the morning and the afternoon of the robbery. See discussion supra Part I.A.3.

A police operator testified that she received a call shortly after midnight on December 22 (the morning after the robbery), apparently from Carr, reporting his car stolen. Although there was some confusion about the interpretation of her report,[17] a reasonable construction of her report was that Carr reported he had last seen the car at his cousin's apartment on December 5 but only realized it had been stolen on December 21. Christopher Spooner testified that Wilton Burton told him Carr's stolen car report was false. See discussion infra Part I.B.2. Although Carr's girlfriend Rita Gwen testified that the last time she had seen the car was on December 9 or 10 parked in front of Christopher Spooner's house, she told the grand jury that she last saw the car at Spooner's as late as December 20.

2. Testimony of Christopher Spooner.

Christopher Spooner is Asia Morgan's husband. Wilton Burton regularly spent the night at their apartment. Spooner testified that Wilton spent the night at their apartment on December 20-21

---

[17]The Government called the police operator's supervisor, who aided in interpreting the stolen car report.

20

and that Wilton left with Carr on the morning of the 21st at 4:30 a.m. Spooner said Wilton and Quinton left in Quinton's car, but he did not actually see them getting into the car; he testified, however, that Quinton's car was parked in front of his apartment building on the morning of December 21.

Spooner testified that he had overheard Wilton and Quinton, talking "about bank robberies" about two weeks before the actual robbery:

Q: Did they both say things in your presence that made you understand they were talking about a bank robbery?

A: Yes.[18]

On cross examination, Spooner stated that Wilton and Carr were "generally speaking" about bank robberies and that they did not refer specifically to the December 21 robbery.[19]

Spooner said that Wilton had not told him that Carr was involved in the bank robbery. Wilton, however, did tell Spooner that they had used Carr's vehicle in the robbery and had then abandoned it at a car wash. Significantly, Wilton told Spooner that Quinton Carr was going to call the police and report his car stolen and that the report would be false.

3. Testimony of Rita Gwen.

---

[18]Spooner also testified that Wilton tried to "bring guns" into his apartment, but that Spooner asked him to remove them.

[19]The court then made a finding that the Government had proved, by a preponderance of the evidence, that there was a conspiracy between Quinton Carr and Wilton Burton and that the statements made by Wilton to Spooner were in furtherance of that conspiracy. See Fed. R. Evid. 801(d)(2)(E). Carr's counsel did not object to the court's ruling and does not raise it as error on appeal.

Rita Gwen, Carr's girlfriend, testified that Carr spent the night with her on December 20-21 and left very early on the morning of December 21, the day of the robbery.  She said he picked her up around noon that day and that he was driving a cream-colored Lexus.  Other witnesses testified that Joshua Burton drove a cream-colored Lexus.  Carr took Gwen to pay bills and dropped her off around 1:00 p.m.  She saw Carr again around 3:00 p.m., when he returned to her place, still driving the Lexus, but this time accompanied by Wilton Burton.  Wilton apparently remained with her and Carr for the rest of the day.  Gwen also testified that Carr, at some point that evening, reported his car stolen; she could not specify whether he called around 7:00 that evening or between 10 and 11:00 p.m.[20]  See also discussion supra Part I.B.1.

### 4.  Conclusion

Our function in reviewing the sufficiency of the evidence is not to determine "whether the trier of fact made the correct guilt or innocence determination, but whether it made a rational decision to convict or acquit."  United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1344 (5th Cir. 1994), quoting Herrera v. Collins, 506 U.S. 390, 402 (1993).  Here, the principle is apposite that "[w]hile each piece of evidence, viewed independently[,] may have been susceptible of innocent interpretation . . . the jury reasonably could have concluded that *when examined in the aggregate*, the evidence sufficed to establish . . . guilt."  Ornelas-Rodriguez, 12

---

[20]The police operator's report indicates that the call came in shortly after midnight.  See supra Part I.B.1.

22

F.3d at 1346. (emphasis added). With that in mind, we find that the evidence was sufficient for a rational trier of fact to find Quinton Carr guilty beyond a reasonable doubt of the crimes charged.

On appeal Carr argues that the Government presented no evidence that he agreed to participate in the robbery. He contends the evidence shows he was "merely associated" with members of the conspiracy and only "aware" of the criminal plan, not that he took part in it. Carr also maintains that the jury could not infer from the use of his car in the robbery, standing alone, that he *allowed* the robbers to use it. Finally, Carr argues that his stolen car report does not allow the inference that he was aiding and abetting the robbery; even if the report was false, according to Carr, the jury could, "at best," infer that Carr was only trying to protect himself when he discovered the car had been used in a robbery.

Carr would have us unduly curtail the "responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Herrera, 506 U.S. at 401-02, quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979). We decline to do so. A rational trier of fact could have found that the evidence before it established far more than Carr's "mere association" with the members of the conspiracy.

The jury reasonably could have found that the use of Carr's vehicle in the robbery, coupled with his sham stolen car report, established that Carr was associated with the robbery, that he

23

participated in it, and that he "sought by action to make the venture succeed." See 18 U.S.C. § 2. The jury could have found this conclusion strengthened by Carr's appearance, before and after the robbery, in Joshua Burton's Lexus. Certainly there is nothing illegal in Carr driving Joshua's car on the day of the robbery, or in his leaving early that morning with Wilton Burton, or in his showing up with Wilton soon after the robbery; but as coincidence piles upon coincidence, a rational jury is entitled to find that criminal activity may be afoot. See Ornelas-Rodriquez, 12 F.3d at 1346.

Finally, a rational jury could have found from Christopher Spooner's testimony that Carr and Wilton Burton were planning the bank robbery in question a mere two weeks before the robbery took place. While Spooner's testimony was vague, the jury did not have to rely solely on it to find that Carr participated in the conspiracy. The jury could also have considered Carr's familial and social relationships with the other members of the conspiracy, and, most importantly, the series of "coincidences" that strongly connected Carr and his vehicle to the robbery itself. See Williams-Hendricks, 805 F.2d at 503.

In sum, we find that a rational jury could have found beyond a reasonable doubt that the Government carried its burden of proof as to Carr.

## II. SENTENCING GUIDELINES

Both Appellants argue that the district court erred in applying a six-point increase to their offense levels pursuant to

24

U.S. Sentencing Guidelines Manual § 2B3.1(b)(2)(B)(1995) for "otherwise using" a firearm. We review the district court's application and legal interpretation of the Sentencing Guidelines *de novo*, United States v. Domino, 62 F.3d 716, 719 (5th Cir. 1995), and its findings of fact for clear error. United States v. Hooker, 997 F.2d 67, 75 (5th Cir. 1993).

The Sentencing Guidelines define "otherwise used" as conduct that "did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1, comment. (n.1(g)). We have held that making threats while brandishing a firearm constitutes "otherwise using" a firearm. United States v. DeLaRosa, 911 F.2d 985, 993 (5th Cir. 1990).

The "relevant conduct" to which we refer in determining Joshua Burton's Guideline range includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). Testimony at trial showed that the robbers waved guns around during the robbery and that at least one of them threatened to kill bank employees if they did not cooperate. The district court found the evidence sufficient to show that Joshua was one of the robbers who entered the bank and that, even if Joshua was not the robber who threatened the bank tellers' lives, such conduct was reasonably foreseeable given the nature of the offense.[21] We find that the

_____

[21]See U.S.S.G. § 1B1.3(a)(1)(B). That the conduct was "reasonably foreseeable" and in furtherance of the robbery would provide an alternate basis for attributing the conduct to Joshua,

district court's findings of fact were not clearly erroneous. Further, we find that the district court correctly interpreted the Sentencing Guidelines in applying the six-level increase to Joshua Burton's offense level.[22]

Regarding Quinton Carr, the "relevant conduct" to which we refer in determining his Guideline range is, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).[23] The district court found that, given the nature of bank robbery, Carr could have "reasonably foreseen" that a weapon would be used during the robbery. Carr argues that the district court's finding that he should have "reasonably foreseen" the use of a firearm was clearly erroneous; he also argues that the district court misapplied the Guidelines by relying on the nature of the offense to determine "reasonable foreseeability". We disagree.

The Commentary to § 1B1.3 of the Guidelines indicates that in

---

even if he were not the robber who made the threats. In any case, the district court's finding that Joshua did make threats during the robbery is not clearly erroneous.

[22]Joshua argues that his conduct warranted only a five-level increase under U.S.S.G. § 2B3.1(b)(2)(C) for "brandishing." The Guidelines define "brandishing" to mean that "the weapon was pointed or waved about, or displayed in a threatening manner." U.S.S.G. § 1B1.1, comment. (n.1(c)). The combination of threats with the display of firearms, however, has been found sufficient to constitute "otherwise using" a firearm. See DeLaRosa, 911 F.2d at 993.

[23]We make a "reasonable foreseeability" determination regarding Carr because in determining his Guideline range we must refer to the conduct of others. Such a determination was not necessary for Joshua since Joshua personally undertook the conduct that determined his range. See U.S.S.G. § 1B1.3, comment. (n.2).

26

determining the scope of the "jointly undertaken criminal activity" the court may consider "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, comment. (n.2). Further, the Illustrations under § 1B1.3 posit a situation in which "Defendant C" is the getaway driver in an armed bank robbery in which a teller is injured:

> Defendant C is accountable for the injury to the teller under subsection (a)(1)(B) because the assault on the teller was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (*given the nature of the offense*).

U.S.S.G. § 1B1.3, comment. (illustration (b)(1)). (emphasis added). See also United States v. Guerrero, 5 F.3d 868, 871 n.7 (5th Cir. 1993).

We find that the district court reasonably inferred from the evidence the scope of the criminal activity to which Carr agreed. The district court's determination that, given such criminal activity, Carr should have reasonably foreseen the use of a firearm was not clearly erroneous. Further, we find that the district court's reliance on the nature of the offense to determine whether the use of a firearm was reasonably foreseeable was not a misapplication of the Guidelines.

We therefore affirm the district court's application of a six-level increase to the offense levels of both Appellants.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM both Appellants' convictions and sentences.

27