**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 98-20740

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN MANUEL CASTRO-HERNANDEZ;
FRANCISCO MANSILLA-HERNANDEZ,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas
(H-97-CR-292)

December 22, 1999

Before KING, Chief Judge, REYNALDO G. GARZA and EMILIO M. GARZA , Circuit Judges.

PER CURIAM:[*]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves an alleged smuggling ring operated out of Houston, Texas, and various Central American countries.  The ring was designed to smuggle illegal aliens into the United States and subsequently harbor, conceal, and transport the aliens upon their arrival.  After a jury trial, Defendant-Appellant Juan Manuel Castro-Hernandez was found guilty on one count of conspiracy to induce illegal immigrants to enter the Unites States and to smuggle, transport, and harbor illegal immigrants, in violation of 18 U.S.C. § 371; and fourteen counts of harboring illegal immigrants in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).  At the same trial, Defendant-Appellant Francisco Mansilla-Hernandez was found guilty of the same conspiracy count and also

_____

[*]Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

of two counts of smuggling an illegal alien into the United States in violation of 8 U.S.C. § 1324 (a)(1)(A). Mansilla-Hernandez was acquitted of fourteen counts of harboring illegal aliens.

On October 27, 1997, agents of the Immigration and Naturalization Service (INS) raided an apartment in Houston, Texas, and arrested the appellants and forty one illegal aliens. Seized during the raid were numerous business cards for "Castro Van Tours." The cards were found scattered about the apartment and in the possession of a number of the illegal aliens. The phone numbers listed on the cards both rang to the raided apartment. One phone number was listed to Juan Castro-Hernandez and the second number was registered to his brother, Jaime Castro-Hernandez. The INS agents also seized large amounts of cash, long distance telephone cards, receipts from wire money transfers, and numerous "tricky bags" belonging to the arrested aliens.[1] Found in Juan's possession was a piece of paper with the name "Nelli" and a phone number. "Nelli" was later determined to be Mansilla-Hernandez's aunt.

According to the Plaintiff-Appellee the United States of America (the Government), the Appellants were part of a smuggling ring that, for a fee, guided illegal immigrants from Honduras and El Salvador through Mexico and into the United States. Once in the United States, the immigrants were transported to the apartment in Houston. After arriving at the apartment, and after having paid additional fees, the immigrants were transported via "Castro Van Tours" throughout the United States.

A complaint was filed on the day of the arrest, and an amended complaint was filed on October 28, 1997. Both complaints named the individual appellants along with other alleged coconspirators. On November 26, 1997, the Government filed a motion to dismiss the complaint and amended complaint without prejudice. The Government complained that despite its most diligent efforts it did not have time to submit the case to a grand jury within the thirty days required by the Speedy Trial Act, 18 U.S.C. § 3161 (b).

---

[1] A "tricky bag" is INS parlance for the small bags carried by many illegal immigrants that normally contain a change of clothes and a few personal artifacts.

Before the Magistrate Judge ruled on the motion to dismiss, the grand jury returned a nineteen count indictment naming both Appellants. Also indicted were Juan Castro-Hernandez's brothers – Hector Castro-Hernandez and Jose Castro-Hernandez, Guillermo Quintero-Valli, and "Nelli," who was shown at trial to be Mansilla-Hernandez's aunt. On January 13, 1998, Mansilla-Hernandez moved to dismiss the indictment with prejudice because he had not been indicted within the time period set by the Speedy Trial Act. This motion was denied.

Only the Appellants and Guillermo Quintero-Valli were present for the duration of the trial. Hector Castro-Hernandez failed to return to court on the second day of the trial. He was tried in absentia. Jose Castro-Hernandez did not show for the trial. He was severed from the case and declared a fugitive. Finally, the person known only as "Nelli" was never arrested, and her true name and whereabouts remain unknown.

During the trial, the Government offered the testimony of Augustin Sanchez-Hernandez, one of the aliens arrested in the October 27, 1997 raid. Over Mansilla-Hernandez's objections, Sanchez-Hernandez testified that another of the arrested aliens, Juan Perez-Molina (Perez-Molina), approached Sanchez-Hernandez while they were in jail and told Sanchez-Hernandez of a conversation he had with Mansilla-Hernandez. According to Perez-Molina, Mansilla told him that the only reason the aliens had not been deported was that Sanchez-Hernandez was cooperating with the INS and that Sanchez-Hernandez needed to quit telling the truth.

After the jury had been charged and sent to deliberate, they sent the following note to the trial judge:

> The first question is: no. 1, is agreement only with Nelli and none of the other defendants sufficient to find agreement exists as needed for conspiracy. Two, conspiring alone, one, bringing an alien in, two, harboring, three, transport and/or- and No. 3 is: should we draw any inference from the lack of a mention of a search warrant for the Brady raid?

The judge answered questions two and three. As to question one, she reminded the jury to follow the instructions already given. Juan Castro-Hernandez's attorney requested and submitted a proposed clarifying instruction regarding the intent prong of a conspiracy charge. The district

3

court rejected this definition as too narrow but agreed to request that the jury clarify its question. The jury returned a verdict without ever responding to this request for clarification.

This appeal followed.

## II. DISCUSSION

Appellants Juan Castro-Hernandez and Mansilla-Hernandez appeal their convictions. Juan Castro-Hernandez alleges three points of error: (1) that the evidence produced at trial was insufficient to support the jury's guilty verdict; (2) that the admission of certain testimony was in error and was so prejudicial as to warrant reversal of his conviction; and (3) that the district court erred in refusing to submit his requested jury instructions regarding Rule 404(b) evidence and the level of intent required for a conspiracy conviction. Mansilla-Hernandez also alleges three points of error: (1) that the district court erred in allowing a government witness to testify regarding statements made to the witness by Juan Perez-Molina; (2) that the district court erred in denying his motion to dismiss the indictment against him because it violated the Speedy Trial Act; and (3) that the fact that one of the Government's witnesses was promised an I.N.S. Work Permit and was released on personal recognizance bond in exchange for his testimony is sufficient grounds for reversal of his conviction. However, finding no error, we AFFIRM the conviction of both Appellants.

### A. The Claims of Juan Castro-Hernandez

#### 1. Sufficiency of the Evidence

When reviewing the jury's verdict, this court must draw all reasonable inferences in favor of the verdict. *Wright v. West*, 505 U.S. 277 (1992). This court will uphold the verdict if any rationale trier of fact could have found that the Government proved each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). However, if the evidence viewed in the light most favorable to the verdict gives near equal circumstantial support to either a finding of guilt or innocence, the jury's verdict should be reversed. *United States v. Grossman*, 117 F.3d 255, 258 (5th Cir. 1997). This does not mean that the evidence at trial must exclude

**4**

every reasonable inference of innocence or be wholly inconsistent with every conclusion except guilt. *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1992). Finally, a guilty verdict on a multi-conspiracy count may be upheld even if there is insufficient evidence to prove one of the objects beyond a reasonable doubt. *Griffin v. United States*, 502 U.S. 46 (1991).

The indictment listed four objects to the conspiracy: (1) to smuggle aliens into the United States; (2) to transport those aliens once they arrived in the United States; (3) to conceal and harbor illegal aliens; and (4) to encourage the aliens to enter the United States illegally. To prove a conspiracy charge against Juan Castro-Hernandez, the government must show that two or more people agreed to pursue an unlawful objective, that Juan Castro-Hernandez voluntarily joined the conspiracy, and that at least one member of the conspiracy committed an overt act in furtherance of the conspiracy's objective. *United States v. Lage*, 183 F.3d 374 (5th Cir. 1999); *United States v. Ismoila*, 100 F.3d 380 (5th Cir. 1996). The conspiracy itself may be tacit and may be inferred from circumstantial evidence, such as concert of action. *United States v. Burton*, 126 F.3d 666, 670 (5th Cir. 1997). Notably, a conspirator may be convicted where his role in the conspiracy is minor or where he participated in one level of the conspiracy. *United States v. Posada-Rios*, 158 F.3d 832, 838 (5th Cir. 1998).

To show that Juan Castro-Hernandez aided and abetted in the objects of the conspiracy, the Government must show that (1) he associated with and participated in the criminal venture, and (2) that he sought by his actions to make the venture succeed. *See United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995). Notably, evidence sufficient to support a conspiracy conviction is often sufficient to support an aiding and abetting conviction. *See United States v. Castilla*, 20 F.3d 600, 603 (5th Cir. 1994).

To prove that Juan Castro-Hernandez harbored aliens in violation of 8 U.S.C. § 1324(a)(1), the Government must show he concealed or harbored the aliens in any place with knowledge or reckless disregard of the alien's illegal status. *See United States v. Esparza*, 882 F.2d 143, 145 (5th Cir. 1989).

5

As the following discussion will show, the weight of the evidence clearly supports the verdict against Juan. At trial, the Government submitted, in relevant part, the following evidence:

1. That Juan was the tenant and probably the lessor of the Brady Street Apartment that the INS Raided and that his brother, Hector, was the lessor of the second apartment raided at the same location.

2. That Juan Castro-Hernandez applied for and paid for a phone number at the apartment. This phone number appeared on the Castro Van Tours business cards that were found in the apartment and on a number of the apprehended aliens. A second phone number, also appearing on the business cards, was registered to Juan Castro-Hernandez's brother Jaime Castro-Hernandez.

3. Two of the apprehended aliens, smuggled into the United States by Guillermo Quintero-Valli, testified that they were transported by their smuggler to the apartment and that Juan ordered them not to leave the house. One of the aliens testified that Juan Castro-Hernandez quoted them a fee for transport to Los Angeles. The other alien testified that Guillermo Quintero-Valli told them that if they did not pay the Castros' fees they would be taken back to Matamoros, Mexico.

4. Augustin Sanchez-Hernandez, one of the aliens arrested at the apartment, testified that Mansilla-Hernandez transported him to the Castros' apartments and that Juan Castro-Hernandez was there when he arrived. Sanchez-Hernandez also testified that the fee he paid was for the purpose of being transported all the way to Houston. He further testified that Mansilla-Hernandez and Juan Castro-Hernandez brought the aliens food and instructed the aliens to remain quiet.

5. INS agents observed a number of vans parked behind the apartments before the raid and uncovered evidence during the raid showing that the Castros were running Castro Van Tours from the apartments. At least 42 undocumented aliens were arrested at the apartments and many were found to be carrying business cards for Castro Van Tours.

6

6. Personal property belonging to Juan Castro-Hernandez was seized at the raid, including a phone number from "Nelli," the individual who, according to the testimony of at least one alien, arranged to smuggle illegal aliens into the United States from Central America, as well as several Castro Van Tours business cards.

7. A Castro Van Tours vehicle had been stopped in Louisiana a few months before Juan Castro-Hernandez's arrest and illegal aliens were found in that van.

In conducting our analysis of the sufficiency of the evidence, we will give zero weight to the evidence challenged by Juan Castro-Hernandez. Juan Castro-Hernandez challenges the admission of two sources of the evidence against him: (1) the statement of Guillermo Quintero-Valli, one of the aliens arrested at the apartments, who told an INS officer that he had entered the United States illegally; traveled to Houston, and contacted Castro Van Tours to obtain a place to stay and transportation to other cities; and (2) the evidence presented at trial regarding the stop of a Castro Van Tours van in Louisiana, which occurred a few months before his arrest and which revealed a number of illegal aliens in the van.

In light of the deference accorded jury verdicts, we find that the evidence whose admissibility is unchallenged is clearly sufficient to support Juan Castro-Hernandez's conviction on all counts. This evidence includes: the fact that Juan Castro-Hernandez was the tenant of the raided apartment in which the illegal aliens were found; that he paid for a phone number at the apartment which appeared on Castro Van Tours business cards; and that Castro Van Tours business cards were found in the possession of many of the aliens arrested at the apartment. Additionally, property belonging to Juan Castro-Hernandez which was seized at the raid included a phone number from "Nelli," the woman who, according to testimony at trial, various aliens had contracted with to help them illegally enter into the United States, and Castro Van Tours business cards. Furthermore, according to the testimony of two of the arrested aliens, Juan Castro-Hernandez ordered the aliens not to leave the apartment, supplied the aliens with food, and gave certain aliens quotes on the price of transportation to other cities. Finally, the testimony at trial

placed coconspirator Mansilla-Hernandez at the raided apartment and indicated that he was involved in controlling the aliens at the apartment. On the basis of the unchallenged evidence, a rational trier of fact could reasonably conclude that: Juan Castro-Hernandez maintained an apartment that was used to harbor aliens; that he worked for Castro Van Tours; that Castro Van Tours was used to transport illegal aliens throughout the country; that Juan Castro-Hernandez was aware that Castro Van Tours was being used to transport illegal aliens; that Juan Castro-Hernandez actively participated in arranging to transport illegal aliens; and that he was aware of and acted in concert with the parties who smuggled the aliens into the United States.

Another thrust of Juan Castro-Hernandez's attack on the conviction is that what the Government proved at trial were numerous individual conspiracies rather than the one over-arching conspiracy charged in the indictment. According to Castro-Hernandez, this variance dictates reversal. To prevail on this claim, Castro-Hernandez must show that a variance existed between the indictment and the proof at trial and that this variance affected his substantial rights. *See United States v. Morgan*, 117 F.3d 849, 858 (5th Cir. 1997).

In fact, no variance existed. The indictment listed four objects to the conspiracy: (1) to smuggle aliens into the United States; (2) to transport those aliens once they arrived in the United States; (3) to conceal and harbor illegal aliens; and (4) to encourage the aliens to enter the United States illegally. The Government presented substantial evidence tying Juan to one or more objects of the conspiracy. As has been discussed, there was sufficient evidence to support the conviction of Juan Castro-Hernandez on all counts.

2.     Allegedly Inadmissable Evidence.

As noted, Juan Castro-Hernandez challenges the admission of two sources of the evidence against him: (1) the statement of Guillermo Quintero-Valli, one of the aliens arrested at the apartments, who told an INS officer that he had entered the United States illegally; traveled to Houston, and contacted Castro Van Tours to obtain a place to stay and transportation to other cities; and (2) the evidence presented at trial regarding the stop of a Castro Van Tours van in

**8**

Louisiana, which occurred a few months before his arrest and which revealed a number of illegal aliens in the van.

The admissibility of this evidence is a moot point in regard to Juan Castro-Hernandez's conviction. Even assuming the exclusion of the challenged evidence, the remaining evidence is so strong that Juan Castro-Hernandez's conviction is surely not attributable to the allegedly inadmissible evidence. Our harmless error analysis is governed by *Chapman v. California*, 386 U.S. 18, 24 (1967), in which the Supreme Court stated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id. See also United States v. Brito*, 136 F.3d 397, 412-13 (5th Cir.), *cert. denied*, 118 S.Ct. 1817, 2389 and 119 S.Ct. 159 (1998) (erroneous admission of marijuana evidence); *United States v. Tomblin*, 46 F.3d 1369, 1387 (5th Cir. 1995) (erroneously admitted F.R.E. 404(b) evidence).

We will once again analyze the overwhelming evidence against Juan Castro-Hernandez for the purpose of the harmless error analysis. Juan Castro-Hernandez was tied to the apartment in which the aliens were discovered by his tenancy in that apartment. He paid for the phone number which rang at one of the apartments. He was present at the apartment at the time the aliens were arrested. There was testimony that he, as well as coconspirator Mansilla-Hernandez, commanded the aliens not to leave the apartment, discussed smuggling fees for transporting aliens, and arranged to bring the aliens food. Thus, the evidence overwhelmingly compels the conclusion that Juan Castro-Hernandez was aware of the presence of illegal aliens in his apartment. He was tied to Castro Van Tours by his registration of a phone number which was used by that business. Since several of the aliens were carrying Castro Van Tours business cards, on which was printed the phone number that Juan Castro-Hernandez registered, the overwhelming implication is that Juan Castro-Hernandez was involved with the business; that the business was tied to the presence and transportation of those aliens; and that Juan Castro-Hernandez was involved in the illegal smuggling of aliens. Additionally, Juan Castro-Hernandez's personal property, seized at the time

**9**

of his arrest, included numerous artifacts connecting him to the overall alien smuggling conspiracy: a phone number for "Nelli," who was shown by various testimony to be an organizer of the smuggling conspiracy and Castro Van Tours business cards. Given the overwhelming strength of this remaining evidence, any error regarding the challenged evidence would be harmless.

### 3. The Requested Jury Instructions

As we will explain, Juan Castro-Hernandez's third claim is clearly without merit. He attacks the court's failure to submit to the jury his requested instructions on Rule 404(b) evidence and the level of intent required in a conspiracy. Such a refusal is reviewed for abuse of discretion. *See United States v. Chaney*, 964 F.2d 437, 444 (5th Cir. 1992). Moreover, this court has held that a refusal to give a requested jury instruction is erroneous if: (1) the instruction is substantially correct; (2) the requested issue is not substantially covered in the charges actually given; and (3) the failure to give the instruction seriously impairs the effective presentation of a given defense. *See United States v. Correa-Ventura*, 6 F.3d 1070, 1076 (5th Cir. 1993); *United States v. Neal*, 951 F.2d 630 (5th Cir. 1992).

Regarding the Rule 404(b) instruction, Juan Castro-Hernandez asked the court to instruct the jury that the INS stop of a Castro Van Tours van in Louisiana could not be considered as evidence that Juan Castro-Hernandez acted in conformity with that allegedly unlawful activity when he was arrested in October of 1997. The district court refused the instruction because it determined that the Louisiana stop was part of the on-going conspiracy charged in the indictment, rather than an extraneous prior bad act to which the limits of Rule 404(b) would apply.

This was not an abuse of discretion. The indictment contends that the conspiracy began on an unknown date and continued through October 27, 1997, the day of the arrests. Additionally, the indictment includes as an object of the conspiracy, "the transportation of aliens, who had come to, entered, and remained in the United States in violation of law." Moreover, forensic experts determined that Juan Castro-Hernandez's handwriting was on the Castro Van

**10**

Tours passenger list that was recovered by the Border Patrol agents who stopped the van. The evidence related to the Louisiana stop was probative of the continuing nature and methods of the smuggling operation. The district court could have reasonably determined that the Louisiana stop was intrinsic evidence of the charged conspiracy, thus rendering inapplicable Rule 404(b)'s limitation on extrinsic evidence. Moreover, any error in admitting the Louisiana stop would be harmless in light of the above-discussed evidence linking Juan Castro-Hernandez to Castro Van Tours and linking that business to the alien smuggling operation.

Next, Juan Castro-Hernandez attacks the district court's refusal to give a clarifying instruction in response to the questions the jury directed to the judge in a note. After the jury had been charged and sent to deliberate, they sent the following note to the trial judge:

> The first question is: no. 1, is agreement only with Nelli and none of the other defendants sufficient to find agreement exists as needed for conspiracy. Two, conspiring alone, one, bringing an alien in, two, harboring, three, transport and/or- and No. 3 is: should we draw any inference from the lack of a mention of a search warrant for the Brady raid?

The requested jury instruction read as follows:

> Intent is an element of conspiracy. Each party must have intended to enter into the agreement for the crime of conspiracy to be proved. There must be evidence sufficient to warrant belief beyond a reasonable doubt that the defendant intentionally entered into an agreement to do an illegal act with the intention of consummating that act.

The district court did not abuse its discretion in refusing to submit this proposed clarifying instruction to the jury. The proposed instruction purported to be an instruction regarding the necessary elements of conspiracy. However, the district court charged the jury with the Fifth Circuit model jury instruction regarding conspiracy. Thus, the district court did fully cover the issue of conspiracy in its initial instructions and committed no abuse of discretion in its refusal to supplement the model jury instructions of the Fifth Circuit.

In conclusion, Juan Castro-Hernandez's conviction is AFFIRMED. He failed to show that the evidence introduced at trial was insufficient to support the guilty verdict against him, or that any admitted evidence constituted prejudicial error, or that the district court erred in charging the

**11**

jury.

### B.    Mansilla-Hernandez

#### 1.    The Admission of Testimony by a Government Witness

At trial, a Government witness, Augustin Sanchez-Hernandez, one of the illegal aliens arrested during the Houston raid, testified that another of the aliens arrested, Juan Perez-Molina, made certain statements to him while they were both in jail. Sanchez-Hernandez testified that after he began cooperating with the INS, Perez-Molina approached him in prison and conveyed a statement that Mansilla-Hernandez had allegedly made to Perez-Molina. Sanchez-Hernandez testified that Perez-Molina said that Mansilla-Hernandez had told him that all the aliens were still being held and had not been deported home because Sanchez-Hernandez was cooperating with the INS. Mansilla-Hernandez objected to this testimony as both inadmissible hearsay and a violation of his Sixth Amendment right to confrontation. The district court found that the testimony was admissible under the coconspirator doctrine. The district court found, in the alternative, that even if Sanchez-Hernandez's testimony concerning Perez's statement were inadmissible, the admission was harmless error.

We conclude, based on the entire record, that the admission of Sanchez-Hernandez's testimony regarding Mansilla-Hernandez's statement to Perez-Molina was harmless error, if it was error at all. As we noted before, our harmless error analysis is governed by *Chapman v. California*, 386 U.S. 18, 24 (1967), in which the Supreme Court stated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* First, the testimony of Sanchez-Hernandez, and that of his aunt, Vasquez, provided substantial evidence independent of Perez-Molina's statement that Mansilla-Hernandez told the aliens to lie about their true identities and countries of origin. Second, the testimony of Sanchez-Hernandez, as corroborated by the testimony of Vasquez, provided substantial evidence of Mansilla-Hernandez's leadership role at crucial points in the conspiracy to smuggle the aliens into the United States and then to transport them to various

points in the United States.

This testimony included that: Mansilla-Hernandez was the nephew of the woman, Nelli, who arranged to smuggle Sanchez-Hernandez into the United States; that Mansilla-Hernandez was present when the payment arrangements were made; that he participated in arranging for food for the aliens; and that Mansilla-Hernandez was the representative of Nelli. Most importantly, various witnesses testified that Mansilla-Hernandez was often in command of the aliens and involved in the arrangements by which they made their way into the United States. He led them across the river into Mexico and then explained the arrangements whereby they would be picked up and taken to the United States. After swimming across the river into the United States, Mansilla-Hernandez ordered the aliens to stay by a highway until vans came to pick them up. Those vans transported the aliens to a house in Brownsville, Texas. Once in Brownsville, and after several of the aliens had been captured by Mexican immigration authorities, he called Nelli to update her on their progress. While at the house in Brownsville, Mansilla-Hernandez ordered Sanchez-Hernandez to contract his aunt, Vasquez, so that she could send the rest of the money owed for smuggling Sanchez-Hernandez into the United States. As part of their journey from Brownsville to Houston, Mansilla-Hernandez led the aliens on a thirty seven hour walking route, during which time he explained that walking imposed less risk of being caught. Once at the apartment in Houston where the aliens and were eventually arrested, Mansilla-Hernandez ordered the aliens to be silent. Also located in the apartment was alleged coconspirator Juan Castro-Hernandez who also ordered the aliens to remain quiet. Additionally, Mansilla-Hernandez brought the aliens at the apartment something to eat.

In summary, this court finds beyond a reasonable doubt that the admission of Sanchez-Hernandez's testimony was harmless error if it was error at all. Given the overwhelming evidence presented that was independent of Sanchez-Hernandez's testimony, the guilty verdict was surely not attributable to the admission of the challenged testimony. Thus we conclude that the admission of that testimony did not affect Mansilla-Hernandez's substantial rights in light of all

**13**

the evidence presented to the jury.

## 2. Speedy Trial Act

Mansilla-Hernandez next contends that the district court should have dismissed his case because the Government failed to indict him within thirty days of his arrest as required by the Speedy Trial Act (STA), 18 U.S.C. § 3161(b). A district court's factual findings made when determining whether to dismiss an indictment under the STA are reviewed for clear error while its legal conclusions are reviewed *de novo*. *See United States v. Narviz-Guerra*, 148 F.3d 530, 538 (5th Cir. 1998).

Mansilla-Hernandez was arrested on October 27, 1997. Once it appeared that Mansilla-Hernandez would not be indicted within thirty days of being arrested, the Government moved to dismiss its complaint without prejudice on November 26, 1997, the thirtieth day after the arrest. On December 4, the Magistrate Judge held a hearing on the motion to dismiss. At the end of the hearing, still on December 4, the Magistrate Judge granted the Government's motion to dismiss the complaint as to Jose Castro-Hernandez. However, as to Mansilla-Hernandez and Juan Castro-Hernandez, the judge took the motion under advisement. On December 22, 1997, before the Magistrate Judge ruled on the Government's motion as to Mansilla-Hernandez and Juan Castro-Hernandez, the grand jury returned an indictment against Mansilla-Hernandez. Therefore the indictment was handed down fifty-six days after Mansilla-Hernandez was arrested.

According to Mansilla-Hernandez, the STA presents an absolute rule such that if an indictment containing the same charges as the complaint is not received within thirty days, the complaint against the defendant must be dismissed. *See United States v. Giwa*, 831 F.2d 538, 540 (5th Cir. 1987). As noted, fifty-six days elapsed between the date of the arrest and the day the indictment was handed down. However, certain days are excluded from this calculation if they fall within the STA's definition of "excludable days." *See* 18 U.S.C. § 3161(h)(1); *United States v. Johnson*, 29 F.3d 940, 942 (5th Cir. 1994). First, § 3161(h)(1)(F) (Subsection F) excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of

**14**

the hearing on, or other prompt disposition of such motion." Thus Subsection F excludes the period from November 26, 1997, the day the Government filed its pre-trial motion (the motion to dismiss), to December 4, 1997, the day the court held a hearing on that motion. *See Johnson,* 29 F.3d at 942 (citing *Henderson v. United States*, 476 U.S. 321 (1986), for the proposition that if a motion requires a hearing, Subsection F excludes the time between the filing of the motion and the hearing on that motion, regardless of whether the delay between the motion and the hearing is unreasonable). Next, § 3161(h)(1)(J) (subsection J) excludes "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." *See Henderson*, 476 U.S. at 328-29 (stating that Subsection J allows exclusions of up to thirty days while the district court has a motion "under advisement"). The motion in question was under advisement by the Magistrate Judge from December 4, 1997 through December 22, 1997, the day the indictment was handed down. Since that period is less than thirty days, it is also excludable under Subsection J.

When the number of non-excludable days is calculated as specified by the STA, it becomes clear that the indictment was handed down within the thirty day period. The Government filed its motion to dismiss the complaint November 26, 1997, the thirtieth day following Mansilla-Hernandez's arrest. As is explained above, all of the days from the filing of the motion to the handing down of the indictment are excludable under Subsections F and J. Thus, the STA clock remained stuck on thirty days when the indictment was handed down, meaning the indictment was timely. We therefore affirm the denial of Mansilla-Hernandez's motion to dismiss the indictment with prejudice.

### 3. Promise of Work Permit in Exchange for Testimony

This court has already rejected Mansilla-Hernandez's argument that the fact that one of the Government's witnesses was promised an INS Work Permit and released on a personal recognizance bond in exchange for his testimony is sufficient grounds for reversal of his conviction under 18 U.S.C. § 201(c)(3). *See United States v. Villegas-Rodriguez*, 171 F.3d 224,

230 (5th Cir. 1999). Accordingly, that argument is rejected again today.

In conclusion, Francisco Mansilla-Hernandez's conviction is AFFIRMED. He failed to show that any admitted evidence constituted prejudicial error, or that there was any violation of the Speedy Trial Act, or that any leniency offered the Government's witness in exchange for truthful testimony required reversal of his conviction.

## IIII.    CONCLUSION

The convictions of Juan Castro-Hernandez and Francisco Mansilla-Hernandez are hereby AFFIRMED.