LINDA MARIE FIELDS, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 49417

December 10, 2009 220 P.3d 724

*Brian D. Green*, Elko; *Strong & Hanni Law Firm* and *Brian C. Johnson* and *William B. Ingram*, Salt Lake City, Utah, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Gary D. Woodbury*, District Attorney, Elko County, for Respondent.

Before CHERRY, SAITTA and GIBBONS, JJ.

# OPINION

By the Court, CHERRY, J.:

Linda Fields was convicted of one count of first-degree murder. She now appeals her conviction on the basis of the district court's admission of evidence of a prior bad act in the form of a prior uncharged conspiracy. Linda argues that such evidence was inadmissible for two reasons. First, Linda contends that the evidence did not fall within the common-plan-or-scheme exception to the general rule excluding bad act evidence because the crime charged was not similar enough to the prior conspiracy. Second, Linda contends that even if the bad act evidence was relevant as proof of a common plan or scheme, such evidence should not have been admitted because its probative value was substantially outweighed by the danger of unfair prejudice.

We conclude that the district court abused its discretion in admitting this bad act evidence because the prior conspiracy was not similar enough to the crimes charged to be relevant as proof of a common plan or scheme. We also conclude that the probative value of the bad act evidence was substantially outweighed by the danger of unfair prejudice. As such, we conclude that a new trial is warranted because the admission of the bad act evidence was not harmless.[1]

## FACTS

### Relationship between the Fieldses and Palensky

Linda and her husband, John Vernon Fields (John), owned the Silver Dollar Bar, a popular bar in Elko, Nevada. Jaromir Palensky was a frequent customer of the Silver Dollar Bar. In April 2002, Palensky went to prison for a felony DUI conviction. Prior to going to prison, Palensky contacted Linda and gave her power of attorney so she could take care of his affairs while he was in prison. During his incarceration, Palensky also instructed Linda to file his taxes, move his trailer so he would not lose it for lack of paying rent, and take out a new life insurance policy with Linda as the beneficiary.

More than a year after his conviction, Palensky completed his term of incarceration. Approximately three months before his re-

---

[1]In view of our holding, we need not address the other issues raised by the parties in this appeal.

lease, the Nevada Division of Parole and Probation contacted Linda to organize Palensky's early release. After meeting with Palensky's parole officer, Linda and John arranged to move Palensky's trailer onto their property. Palensky then worked and lived on the Fieldses' ranch until his disappearance in December 2003. The Fieldses alleged that, prior to his disappearance, Palensky made a will that made the Fieldses his heirs.

A month after Palensky's disappearance, on January 14, 2004, his body was found floating face down in the Jordan River near Salt Lake City, Utah, by the Salt Lake County Sheriff's Department. Dr. Edward Leis, employed by the Utah State Medical Examiner's Office, performed an autopsy of Palensky's body and concluded that Palensky died of a combination of four blows to the back of his head inflicted by a blunt instrument. Dr. Leis testified that he could not be certain how long Palensky was in the water, but he could not deny that the body could have been in the water up to 24 days given the water temperature.

Detective Brent Adamson, a detective with the Salt Lake County Sheriff's office, was in charge of identifying Palensky's body and the subsequent investigation into Palensky's murder. Adamson did not receive any leads regarding Palensky's death. The only people to contact Adamson were people Palensky knew many years prior when he lived in Carbon County, Utah. In Palensky's wallet, there was a phone number for the Fieldses, which Adamson called. John answered and told Adamson that Palensky was a former employee who left the ranch a month prior and told Adamson to call Linda for more information. A few days after the phone call, Adamson traveled to Elko and to the Fieldses' ranch where he spoke to the Fieldses in person. Linda and John provided Adamson with all of Palensky's documents, including his trailer registration. Linda also provided Adamson with an agreement between her and Palensky in which Linda agreed to pay off five debts for Palensky. John was present when Linda gave this document to Adamson. Adamson and the Fieldses discussed that on December 19, 2003, Palensky was so intoxicated during work that the Fieldses had to send him to his trailer. Later that evening lights were on in Palensky's trailer, but he was not there, and the Fieldses told Adamson that was the last time they saw Palensky. Adamson looked at Palensky's trailer but did not see anything suspicious. Eventually, the Salt Lake County Sheriff's Office abandoned its investigation of the Palensky murder. Kevin McKinney, a detective with the Elko County Sheriff's Department, began investigating Linda after he was contacted by her brother, Mike Walker, and her sister-in-law, Niqua Walker, in September 2006.

Mike and his wife, Niqua, moved onto the Fieldses' ranch in the summer of 2006. Prior to moving in with Linda, Mike was es-

tranged from his sister for many years. In late July 2006, Linda told Niqua that she caught Palensky molesting her grandson in the shed and that she killed Palensky by hitting him in the head with a pipe. Niqua discussed this admission with Mike, and they decided to alert the police. John was not around when Linda allegedly confessed to Niqua that she killed Palensky. Thereafter, Mike and Niqua were evicted from the Fieldses' property for alleged drug use.

Mike and Niqua contacted McKinney with information that Linda was involved in Palensky's murder. They told McKinney about Linda's confession to Niqua. Niqua told McKinney she did not believe Linda because Linda lies a lot. Thereafter, McKinney inquired into the prior police investigation in Salt Lake City. In October 2006, McKinney and the Elko County Sheriff's Department took over as primary investigators on the Palensky murder, with McKinney as lead investigator. McKinney set up a confrontation between Mike and Linda on November 22, 2006, by putting a body wire on Mike and instructing him to confront the Fieldses about Palensky's murder. As soon as Mike entered the property, John told him to leave, and Mike left.

In November 2006, McKinney spoke to John at the sheriff's office regarding the death of Palensky. John told McKinney that he did not know about the death of Palensky but told McKinney that Patricia Grenz, a friend of the Fieldses, now owned the trailer Palensky lived in when he worked on the Fieldses' ranch. Grenz bought Palensky's trailer from its original owner after Palensky's disappearance. Thereafter, the police came to Grenz and took the trailer in which Palensky once lived in order to search it. The Fieldses also sold a red Toyota pickup to Grenz sometime before 2004. Previously, Mike and Niqua told McKinney that this pickup was used by the Fieldses to transport Palensky's body. McKinney conducted a search of Palensky's trailer and the red Toyota pickup.

Linda was charged with open murder with the use of a deadly weapon and accessory to open murder with the use of a deadly weapon. Linda was convicted by a jury of murder in the first degree in the death of Palensky.

*Bad act evidence—Mobert conspiracy*

At trial, in an attempt to establish a possible motive linking Linda to Palensky's murder, the State introduced evidence of a prior uncharged conspiracy involving the Fieldses and Roy Mobert. Mobert and the Fieldses were friends who later developed a business partnership when Mobert assigned power of attorney to Linda. Mobert was elderly and in poor health, and Linda sold his property for him and arranged other affairs with the power of attorney. The business relationship soon soured, and the Fieldses filed a civil suit against

Mobert, who filed a counterclaim. Mobert and the Fieldses settled this suit in 2000. Mobert died of natural causes in 2007, when Linda no longer held rights of survivorship or any other potential for pecuniary gain from Mobert.

At a hearing on pretrial motions in the instant case, the State put on Gregory Corn as a witness. Corn was Mobert's attorney in the civil suit between Mobert and the Fieldses, wherein the Fieldses claimed that Mobert did not follow through on a promissory note to sell the Silver Dollar Bar to them. However, Corn was not Mobert's attorney when Linda obtained power of attorney for Mobert. Corn also wrote a will for Mobert, revoking a prior will where Mobert left his entire estate to the Fieldses. The court ruled that the will could be admitted into evidence.

At the same pretrial hearing, the State called James Pitts, a detective with the Elko County Sheriff's Department. Pitts worked an investigation involving John, Linda, and Billy Wells a regular police informant after Wells told the police that the Fieldses had solicited him to murder Mobert. In 2001, Pitts rigged Wells with a microphone and instructed him to meet with Linda and John about the possible murder for hire in an attempt to record Linda and John soliciting Wells to murder Mobert. The State sought to admit the recorded conversations under the motive exception to NRS 48.045 because it showed Linda's involvement in a prior murder solicitation. Linda objected to the admission of the tape on the basis of relevancy and prejudicial value. The court ruled that it would admit the tape at trial with a cautionary instruction.

Before Corn testified at trial, the district court gave a limiting instruction pursuant to *Tavares v. State*[2] regarding the bad act testimony to be given by Corn and Pitts. At trial, Corn testified that Linda sold Mobert's bar in Jarbidge, Nevada, and that she took the proceeds from this sale, as well as proceeds from the sale of a house for Mobert, and opened a checking account in her own name. Linda then used this money to buy a vehicle for her daughter and to make improvements on the Silver Dollar Bar. On behalf of Mobert, Corn prepared a counterclaim against the Fieldses, claiming that Linda defrauded and misused the power of attorney against Mobert. Eventually, the civil suit settled.

Also at trial, and after the district court gave the *Tavares* instruction, Larry Kidd, Jr., a police officer with the City of Elko, testified that Wells told him that Wells had been contracted by the Fieldses to

---

[2]117 Nev. 725, 733, 30 P.3d 1128, 1133 (2001) (stating that the trial court, absent a waiver from the defendant, must give a limiting instruction explaining the purposes for which bad act evidence is admitted immediately prior to its admission and a general instruction at the end of trial reminding the jurors that certain evidence may be used only for limited purposes).

kill Mobert in 2001. Kidd helped Pitts set up Wells's audio surveillance to record the meeting between Wells and the Fieldses. Pitts testified at trial that he and Kidd had wired Wells after Wells approached Kidd regarding the Fieldses alleged solicitation to murder Mobert. Pitts also authenticated the recording that was made from Wells's wired conversation with the Fieldses and identified the voices on that recording as belonging to John, Linda, and Wells. Thereafter, excerpts from the conversation were played. Kidd also testified that after the investigation and audio surveillance, no charges were filed against John or Linda. Kidd testified that the audio surveillance failed to provide substantial evidence.

Wells was a paid informant for the narcotics task force, but there was no testimony regarding whether Wells was paid for this specific task. By introducing evidence of this uncharged prior conspiracy involving Mobert, the State sought to convey to the jury that with both Palensky and Mobert, the Fieldses, and Linda in particular, planned to take advantage of elderly men by obtaining a power of attorney, using that power of attorney to get money and assets, and then murdering the elderly men for their estates.

After deliberating, the jury returned a guilty verdict. The district court sentenced Linda and entered a judgment of conviction. This appeal followed.

## DISCUSSION

*Admission of bad act evidence*

We defer to the district court's discretion in admitting or excluding evidence of prior bad acts. *Braunstein v. State*, 118 Nev. 68, 72, 40 P.3d 413, 416 (2002). We will not reverse such determinations absent manifest error. *Id.*

In analyzing the propriety of admitting evidence of prior bad acts, we have instructed trial courts to follow the parameters of NRS 48.045(2). *Id.* at 75, 40 P.3d at 418. Under NRS 48.045(2), such evidence is not admissible to prove the character of a person in order to show that he acted in conformity therewith but may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Before admitting evidence of prior bad acts, the district court must, outside the presence of the jury, determine whether: (1) the evidence is relevant, (2) the prior bad act is proven by clear and convincing evidence, and (3) the danger of unfair prejudice substantially outweighs the evidence's probative value. *Meek v. State*, 112 Nev. 1288, 1292-93, 930 P.2d 1104, 1107 (1996). Here, we focus on the relevance of

the bad act evidence and whether its probative value is outweighed by unfair prejudice.

*Relevance and the danger of unfair prejudice*

Prior bad act evidence is admissible pursuant to the common-plan-or-scheme exception of NRS 48.045(2) when both the prior bad act evidence and the crime charged constitute ''an 'integral part of an overarching plan explicitly conceived and executed by the defendant.' The test is not whether the other offense has certain elements in common with the crime charged, but whether it tends to establish a preconceived plan which resulted in the commission of that crime.'' *Ledbetter v. State*, 122 Nev. 252, 260-61, 129 P.3d 671, 677-78 (2006) (quoting *Rosky v. State*, 121 Nev. 184, 196, 111 P.3d 690, 698 (2005)) (other internal citations and quotation marks omitted).

Although the State presented evidence of Linda's financial motive to the jury, the State also chose to present an alternative motivation theory to the jury that Linda killed Palensky for molesting her grandson. At trial, Niqua Walker testified, as a witness for the State, that Linda told her that she killed Palensky after she caught him molesting her grandson. This theory presented by the State is not at all in line with the State's theory of relevancy with respect to evidence of the Mobert conspiracy—that the Fieldses took advantage of elderly victims by changing their wills and then hiring an outsider to kill them. Therefore, we conclude that the district court abused its discretion in admitting evidence of the prior uncharged bad acts alleged as the Mobert conspiracy.

Also, there is a significant distinction between Mobert and Palensky. Mobert was in his late seventies, in poor health, and needed to have his affairs taken care of by another person at the time of the alleged conspiracy, whereas Palensky was in his sixties, in good health, and still had the strength to work on a ranch. The State portrayed to the jury that both of these victims were the same—elderly, frail, and helpless—when they were allegedly taken advantage of by the Fieldses. We conclude that this portrayal is inaccurate because the victims were not in the same circumstance such that they could be considered similar enough to be part of a *preconceived plan* as they were not the same age or in the same condition.

Mobert died of natural causes in 2007 after there was a civil settlement approved by the court between him and the Fieldses—there was no ongoing dispute over money at the time of his death. Palensky was murdered, and there was no dispute with the Fieldses over money before his death. The circumstances of the alleged conspiracies are not similar, and the prior conspiracy alleged against Linda

involving Mobert is irrelevant because the manner and cause of death of each of the victims are wholly different.

We conclude that the district court abused its discretion in admitting evidence of the Mobert conspiracy because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, and its admission led to serious jury confusion. Evidence of an alleged solicitation to murder Mobert from a police informant is not relevant and goes solely to a showing of bad character. Additionally, since Mobert and Palensky were not similarly situated, the probative value of the evidence of the Mobert conspiracy was substantially lowered, thus increasing the probability of this evidence causing prejudicial harm to Linda.

Furthermore, NRS 48.035(1) provides for the exclusion of evidence, even if relevant, if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Here, we conclude that the district court abused its discretion in the admission of evidence of the Mobert conspiracy because it was more prejudicial than probative and it led to serious jury confusion since the State also argued Linda's motive was based upon the alleged molestation.

The State spent considerable time playing excerpts of the recordings of the conversations between Linda, John, and Wells related to the alleged Mobert conspiracy and presenting Corn's testimony regarding the civil suit between the Fieldses and Mobert. Explaining every aspect of a civil suit within a criminal prosecution is potentially confusing to the jury because the standards and evidence are very different. The alleged conspiracies were not sufficiently similar for the Mobert conspiracy to be admitted under the common-plan-or-scheme exception. Additionally, the State continually referenced the Mobert conspiracy during its closing argument, while also arguing that Linda murdered Palensky for molesting her grandson. Finally, Linda was not charged with conspiracy to commit murder, significantly increasing the possibility of unfair prejudice and jury confusion with the introduction of the Mobert conspiracy evidence.

Although we conclude that the district court abused its discretion in admitting this uncharged prior bad act evidence, a new trial is not warranted unless the error was not harmless.

*Harmless error*

In reviewing nonconstitutional error, we use the standard set forth in *Kotteakos v. United States*, 328 U.S. 750 (1946), which is identical to NRS 178.598. *Tavares*, 117 Nev. at 732, 30 P.3d at 1132. "The test under *Kotteakos* is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Kotteakos*, 328 U.S. at 776). Accordingly, unless it is clear

that the defendant "suffered no prejudice as determined by the *Kotteakos* test, the conviction must be reversed." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 741 (1993)).

We conclude that the district court's improper admission of the bad act evidence regarding the Mobert conspiracy was not harmless for two reasons. First, we conclude that the unfair prejudice Linda suffered from the admission of the bad act evidence substantially outweighed any probative value of such an admission. Second, we conclude that the error in admitting the evidence certainly had a substantial and injurious influence in determining the jury's verdict because the alleged prior bad act was so serious and potentially confusing to the jury. Therefore, the admission of the evidence regarding the Mobert conspiracy—evidence of an alleged prior murder solicitation by Linda—surely had an impact on the jury's verdict because even if the jury could not tie Linda to Palensky's murder, the guilty verdict rendered could have been determined, in part, by the admission of evidence of Linda's alleged solicitation to kill Mobert.

## CONCLUSION

We conclude that the district court abused its discretion in admitting evidence of the Mobert conspiracy pursuant to NRS 48.035 and NRS 48.045. The probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Finally, we conclude that a new trial is warranted because the admission of such evidence was not harmless—the confusing admission of the tapes and the amount of time spent on discussing the alleged uncharged conspiracy surely had an impact on the verdict. Accordingly, we reverse the judgment of conviction and remand this case to the district court for further proceedings consistent with this opinion.

SAITTA and GIBBONS, JJ., concur.