129 Nev., Advance Opinion 59

IN THE SUPREME COURT OF THE STATE OF NEVADA

DEYUNDREA ORLANDO HOLMES,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 58947

**FILED**

AUG 22 2013

Appeal from a judgment of conviction, pursuant to a jury verdict, of first-degree murder and robbery, both with the use of a deadly weapon. Second Judicial District Court, Washoe County; Janet J. Berry, Judge.

*Affirmed.*

Law Office of Richard F. Cornell and Benjamin D. Cornell, Reno, for Appellant.

Catherine Cortez Masto, Attorney General, Carson City; Richard A. Gammick, District Attorney, and Terrence P. McCarthy, Deputy District Attorney, Washoe County, for Respondent.

_____

BEFORE PICKERING, C.J., HARDESTY and SAITTA, JJ.

*OPINION*

By the Court, PICKERING, C.J.:

Appellant Deyundrea "Khali" Holmes appeals his conviction of first-degree murder and robbery. He argues that the fairness of his trial

13-24760

was compromised by the district court's erroneous admission into evidence of: (1) inflammatory rap lyrics Holmes wrote while in jail in California; (2) a coconspirator's out-of-court statement that Holmes "went off" and "just started shooting"; and (3) unwarned statements that Holmes made to the Nevada detectives who interviewed him in California before his arrest. We reject these and Holmes's other assignments of error and affirm.

## I.

Kevin "Mo" Nelson was a drug dealer who operated out of a recording studio in Reno, Nevada. Holmes plotted with Max Reed and others, including Jaffar "G" Richardson, to steal drugs and money from Nelson. The night of the robbery, Holmes and Reed went to the studio. No one was there, so Reed called Richardson, who regularly did business with Nelson, and asked Richardson to call Nelson and lure him to the studio on the pretense of a methamphetamine sale. Soon after Richardson made the call, Nelson arrived with a friend, Kenny Clark.

Two men wearing ski masks and black clothes (later identified as Holmes and Reed) accosted Nelson and Clark in the studio's parking lot. Nelson tried to fight them off. At one point the fight moved into Clark's SUV, where Nelson managed to stash his money and drugs under the passenger seat. In the fight, Nelson's pockets were "bunny-eared" (turned inside out). His assailant tore off Nelson's shirt and chain necklace, pistol-whipped him, and then tried to drag Nelson from the parking lot into the studio without success. Frustrated, Nelson's assailant removed his ski mask and said, "I'm going to shoot this f@#$ing guy," which he did. Nelson staggered, then fell and died. Clark managed to call 911 and flee.

The police investigated and took witness statements from Clark and other eyewitnesses, but could not initially identify the two assailants. They did find a fresh, unweathered cigarette butt near the scene, from which the crime lab extracted a DNA sample. But the sample did not produce a database match, so the case went cold.

Three years later, a routine database search matched the DNA from the cigarette to a sample Holmes gave California parole authorities. Nevada detectives traveled to California to interview Holmes at his parole officer's office. Holmes denied having been to Reno except once for "Hot August Nights"—Nelson was killed on a snowy November night. The detectives arrested Holmes and charged him with murder and robbery. While in jail awaiting extradition, Holmes wrote 18 rap songs, a stanza from one of which was admitted, over objection, at his trial.

The State presented its case through detectives, eyewitnesses, including Clark,[1] and various associates of Holmes and Reed. The evidence established that Holmes came to Reno from Oakland two months before, and vanished right after the crime. A young woman testified that she drove Holmes and Reed from her brother's house to Nelson's studio that night. After dropping them off, she waited for them, as requested, on a side street nearby. When Holmes and Reed returned, they were agitated and urged her to "go, go." On the ride back to the brother's house, Holmes kept muttering, "he wouldn't quit moving"; she also overheard Reed place

---

[1]Clark identified Holmes in court as the shooter, stating that he got a clear look at him after he removed his ski mask and shot Nelson. Holmes initially challenged this eyewitness identification as suspect but abandoned the challenge in his reply brief based on *Perry v. New Hampshire*, 565 U.S. ___, 132 S. Ct. 716 (2012).

a cell phone call and say, "come get me, something [bad] just went down." The young woman's brother, who was on house arrest, testified that when his sister returned with Holmes and Reed, Holmes had a chain necklace wrapped around his hand and a cell phone, neither of which he'd had before. The brother also testified that he overheard Holmes call Richardson and say, "Man it's all bad, I need to get up out of here." Not long after, Richardson arrived, then left with Reed.

Richardson also testified. He did so pursuant to a plea agreement, under which he was convicted of, and served time for, conspiring with Holmes and Reed to rob Nelson, and other, unrelated crimes. Richardson was a generation older than Reed and Holmes. He testified that he, Reed, and Holmes had discussed robbing Nelson and that, at Reed's request, he called Nelson to lure him (and his cash and drugs) to the studio the night of the crime. According to Richardson, he went to the getaway driver's brother's house after the murder/robbery because Reed called, said that, "It went wrong," and asked to talk "face to face." Richardson then drove Reed past Nelson's studio to view the scene; police and ambulance personnel were still there when they drove by. In the car, Reed told Richardson that "Khali [Holmes] went off and he don't know what happened. Khali just started shooting him." Richardson also testified that the morning after the shooting, he drove Holmes to the Greyhound bus station and gave him money to leave town. Richardson testified that Holmes told him not to trust Reed.

The jury found Holmes guilty of robbery and first-degree murder, both with the use of a deadly weapon. Holmes timely appealed.

## II.

We review Holmes's claims of evidentiary error under an abuse of discretion standard. *Lamb v. State*, 127 Nev. ___, ___ n.7, 251 P.3d 700, 710 n.7 (2011). "[I]n determining the relevance and admissibility of evidence," a district court's discretion is "considerable." *Crowley v. State*, 120 Nev. 30, 34, 83 P.3d 282, 286 (2004) (internal quotations omitted). A decision "to admit or exclude evidence will not be reversed on appeal unless it is manifestly wrong." *Archanian v. State*, 122 Nev. 1019, 1029, 145 P.3d 1008, 1016 (2006).

### A.

Holmes's first claim of evidentiary error focuses on the district court's admission of lyrics from "Drug Deala," a rap song Holmes wrote in jail awaiting extradition to Nevada. The lyrics read:

> But now I'm uh big dog, my static is real large. Uh neighborhood super star. Man I push uh hard line. My attitude shitty nigga you don't want to test this. I catching slipping at the club and jack you for your necklace. Fuck parking lot pimping. Man I'm parking lot jacking, running through your pockets with uh ski mask on straight laughing.

The district court determined that the jury could reasonably view the lyrics as factual, not fictional, and that, if it did, the jury could find that the lyrics amounted to a statement by Holmes, *see* NRS 51.035(3)(a) (party statements are non-hearsay when offered against the party who made them), that tended to prove his involvement in the charged robbery. So viewed, the lyrics would be both relevant, *see* NRS 48.015 ("'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or

less probable than it would be without the evidence"), and presumptively admissible, NRS 48.025(1) (with certain exceptions, "[a]ll relevant evidence is admissible").

The district court acknowledged that admitting gangsta rap carries the risk of it being misunderstood or misused as criminal propensity or "bad act" evidence. *See* Andrea Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. & Arts 1, 18, 22, 25-26 (2007) ("gangsta" is a subgenre of rap that "purports to reflect life in the inner city," draws on devices such as metaphor, braggadocio, and exaggeration for effect, and uses words that may be offensive and prone to misinterpretation by jurors and courts unfamiliar with rap). But it determined that the "probative value" of the "Drug Deala" lyrics was not "substantially outweighed by the danger of unfair prejudice." NRS 48.035(1). Partly answering Holmes's concerns, the district court instructed the jury that, "Statements of the defendant [that] have been admitted in evidence . . . may be confessions, admissions, or neither." It also gave the jury a limiting instruction:

> You have heard testimony about certain "rap" song lyrics allegedly written by the defendant while in custody awaiting extradition to Nevada. The evidence of these rap lyrics is not to be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit a crime.[2]

---

[2]The district court also deemed the lyrics admissible under the permissible, nonpropensity-purposes list in NRS 48.045(2), which provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove" bad character or criminal propensity but may be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This was error.

*continued on next page...*

The limiting instruction reiterated that, "You may . . . consider if the above lyrics are confessions, admissions, o[r] neither."

We recognize, as did the district court, that defendant-authored rap lyrics "may employ metaphor, exaggeration, and other artistic devices," Dennis, *supra*, at 14, and can involve "abstract representations of events or ubiquitous storylines." *Id.* at 26. But these features do not exempt such writings from jury consideration where, as here, the lyrics describe details that mirror the crime charged. *See United States v. Stuckey*, 253 F. App'x 468, 482 (6th Cir. 2007) ("Stuckey's lyrics concerned killing government witnesses and specifically referred to shooting snitches, wrapping them in blankets, and dumping their bodies in the street—precisely what the Government accused Stuckey of doing [to the victim] in this case"; thus, the district court did not abuse its discretion in deeming the lyrics relevant and admissible); *Daniels v. Lewis*, No. C 10-04032 JSW, 2013 WL 183968, at *10, *12 (N.D. Cal. Jan. 17, 2013) ("The details set forth in the lyrics were sufficiently close to the evidence of the crimes that [they] could be viewed as autobiographical"; they "were fairly admitted as admissions because they constitute direct evidence of [defendant's] involvement in the crimes charged." (first alteration in original) (internal quotations omitted)); *see* Dennis, *supra*, at 8

---

...*continued*
The State offered the lyrics to show that Holmes committed the charged crimes, not as evidence of *other* crimes, wrongs, or acts. *See Greene v. Commonwealth*, 197 S.W.3d 76, 87 (Ky. 2006). Also, if one or more of NRS 48.045(2)'s permissible, nonpropensity purposes applied, the district court should have identified the purpose(s) in its ruling and the limiting instruction, rather than reflexively reciting the full list of permissible purposes contained in NRS 48.045(2). *Newman v. State*, 129 Nev. ___, ___, 298 P.3d 1171, 1178 (2013).

Supreme Court
of
Nevada

(O) 1947A

7

("[o]verwhelmingly, courts admit defendant-composed rap music lyrical evidence" if direct relevance is shown). It is one thing to exclude defendant-authored fictional accounts, be they rap lyrics or some other form of artistic expression, when offered to show a propensity for violence, as in *State v. Hanson*, 731 P.2d 1140 (Wash. Ct. App. 1987), on which Holmes relies. It is quite another when the defendant-authored writing incorporates details of the crime charged. As *Stuckey* notes, "If, in *Hanson*, the defendant's writings had stated that he robbed a 7-11 and shot the clerk in the abdomen (as the defendant had been accused of doing), surely the case would have come out differently." 253 F. App'x at 483.

Nor can we accept Holmes's view that a trial court's decision to admit or exclude defendant-authored rap lyrics is so fraught with risk of misinterpretation and prejudice that a special rule imposing heightened admissibility requirements is needed. "Rap is no longer an underground phenomenon" but has become "a mainstream music genre." *Stuckey*, 253 F. App'x at 484. In this arena, as others, courts should be

> ... unafraid to apply firmly-rooted canons of evidence law, which have well-protected the balance between probative value and prejudice in other modes of communication. Undoubtedly, rap lyrics often convey a less than truthful accounting of the violent or criminal character of the performing artist or composer. . . . [But t]here are certain circumstances . . . where the lyrics possess an inherent and overriding probative purpose. One circumstance would be where the lyrics constitute an admission of guilt, but others would include rebutting an offered defense and impeaching testimony. Although there is no definitive line that demarcates the amount or

SUPREME COURT
OF
NEVADA

(O) 1947A

> content of lyrics that may be used appropriately, reasonableness should govern.

*Hannah v. State*, 23 A.3d 192, 204-05 (Md. 2011) (Harrell, J. concurring).

It was not unreasonable for the district court to admit the short stanza from "Drug Deala" that it did. Like the lyrics in *Stuckey* and *Daniels*, the stanza included details that matched the crime charged. "Jacking" is slang for robbery, *The Rap Dictionary*, http://www.rapdict.org/Jack (last visited May 23, 2013)—one of the charges Holmes faced. The lyrics' reference to "jack[ing] you for your necklace" may fairly refer to Holmes stealing Nelson's chain necklace during the robbery. Police never recovered the necklace, but Holmes had a chain necklace after the crime that he did not have before; his knowledge of the necklace as reflected in the lyrics suggests that he knew Nelson and may have participated in the crime. The lyrics also discuss ski masks, a parking-lot jacking of a "drug deala," and emptying a victim's pockets—facts about the crime that the State established, particularly through eyewitness Clark.

Holmes counters that these features of "Drug Deala" are so clichéd that they do not distinguish the robbery his lyrics describe from other rapped-about, garden-variety robberies. The lyrics' lack of originality may reduce but does not eliminate their probative value. The extent of the lyrics' probative value was a matter for cross-examination, argument, or even, perhaps, expert testimony. *See* Dennis, *supra*, at 35-36. But so long as evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence," it is "relevant." NRS 48.015. Here, the similarities between the lyrics and the facts of the

SUPREME COURT
OF
NEVADA

(O) 1947A

charged robbery, as established by the evidence and the timing of the composition after Holmes's arrest, met the threshold test of relevance.

No doubt the lyrics carried the potential for prejudice. But "[a]ll evidence offered by the prosecutor is prejudicial to the defendant; there would be no point in offering it if it were not." *United States v. Foster*, 939 F.2d 445, 456 (7th Cir. 1991). The real question is whether the lyrics' probative value was substantially outweighed by the danger of *unfair* prejudice. NRS 48.035; *see Schlotfeldt v. Charter Hosp. of Las Vegas*, 112 Nev. 42, 46, 910 P.2d 271, 273 (1996) (the "substantially outweigh" requirement "implies a favoritism toward admissibility"). Evidence is "unfairly" prejudicial if it encourages the jury to convict the defendant on an improper basis. *State v. Eighth Judicial Dist. Court (Armstrong)*, 127 Nev. ___, ___, 267 P.3d 777, 781 (2011).

Holmes identifies two potential sources of unfair prejudice: first, jurors unversed in rap may misuse the lyrics as evidence of bad character or criminal propensity, which NRS 48.045(2) forbids; second, jurors may misunderstand the genre and too readily accept artistic expression (read, exaggeration) as autobiographical fact. Unlike *Hannah*, where the prosecutor examined the defendant about a series of ten rap lyrics he had written, seemingly for no purpose other than to demonstrate that he had a propensity for violence, 23 A.3d at 192-93, 202, only a single stanza from "Drug Deala" was admitted against Holmes—and the stanza that was admitted relayed facts quite similar to the crime charged. Also, the district court crafted and gave an appropriate limiting instruction. *Schlotfeldt*, 112 Nev. at 46, 910 P.2d at 273; *see People v. Wallace*, 873 N.Y.S.2d 403, 404 (App. Div. 2009) (affirming conviction based in part on admission of rap lyrics because the trial court gave a limiting instruction

to alleviate the potential for unfair prejudice). Thus, the jurors were told that they could consider Holmes's statements, including the "Drug Deala" lyrics, as "confessions, admissions *or neither*" and that they could not use the lyrics as evidence of bad character or criminal propensity. So, if the jurors followed the instructions, as we presume they did, *Lisle v. State*, 113 Nev. 540, 558, 937 P.2d 473, 484 (1997), they only would have considered the lyrics if they found that the lyrics were autobiographical, like a diary or journal entry, and they would not have allowed their feelings about rap music—good, bad, or indifferent—to influence their verdict. Even though the lyrics were prejudicial, the district court did not abuse its discretion in determining that the risk they carried of unfair prejudice did not substantially outweigh their probative value. *See Elvik v. State*, 114 Nev. 883, 897, 965 P.2d 281, 290 (1998).

B.

Holmes's second claim of evidentiary error focuses on Richardson's testimony that Reed told Richardson after the crime that Holmes "went off" and "just started shooting." Holmes contends that this did not qualify as a non-hearsay statement by a coconspirator under NRS 51.035(3)(e), because Reed did not make the statement to Richardson "during the course and in furtherance of the conspiracy," as the statute requires. We reject this claim for two reasons. First, the record does not establish that the error was adequately preserved. Second, the record does not establish an abuse of discretion by the district court in ruling as it did. *See Fields v. State*, 125 Nev. 785, 795, 220 P.3d 709, 716 (2009) (en banc) ("whether proffered evidence fits an exception to the hearsay rule [is reviewed] for abuse of discretion").

Some context is helpful. The challenged testimony came toward the end of a series of questions by the prosecutor eliciting what Reed said to Richardson, on the phone and in person, the night of the crime. Initially, the prosecutor asked Richardson what Reed said when he called to see if Richardson could persuade Nelson to come to the studio, to which Holmes interposed a general hearsay objection. The prosecutor responded that "[t]hese are all statements of a coconspirator," and thus not hearsay; Holmes offered no response, and his objection was overruled. *See* NRS 51.035(3)(e) (a statement offered against a party is not hearsay when made "by a coconspirator of a party during the course and in furtherance of the conspiracy"). The prosecutor next asked Richardson, without objection, what Reed said to him when he called him after the crime—Richardson responded that Reed said that "[i]t went wrong . . . he couldn't really talk right then, just wanted to see me face to face." Richardson proceeded to say that he picked Reed up, drove him by Nelson's studio, and talked to him about "[w]hat happened at the studio." The prosecutor then asked, without objection: "What did he [Reed] tell you?," to which Richardson replied, "He said Khali [Holmes] went off and he don't know what happened. Khali just started shooting." After two more questions and answers, defense counsel asked to approach the bench. At this point, the record goes dark. It says only: "unreported discussion at the bench between court and counsel." The record resumes with a statement by the court that, "rather than the defense attorney interposing objections throughout the testimony we have agreed that the court will explain to you that some of these statements are coming in under a legal theory of a co-conspirator, [about which] you will receive further legal instruction."

NRS 47.040(1)(a) states that "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection." The State argues that "a timely objection" was not made, *see* 2 *Wharton's Criminal Evidence* § 8:32 (15th ed. 1998) (as a general rule, "[i]t is incumbent on counsel to state an objection to a question before the answer is given" because "the question usually indicates if the answer is objectionable or not"); also, that no "motion to strike appears of record." *See* 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5037.7, at 749 (2d ed. 2005) (even a permissibly delayed objection "alone does not suffice to preserve an error"; the objector should also move to strike). We would probably reject the State's argument, if the record adequately established "the specific ground of objection," NRS 47.040(1)(a), but it does not. This leaves us to speculate as to whether error, still less an abuse of discretion, occurred.

Nevada's hearsay statute, like its federal counterpart, "contains at least four possible bases for [a hearsay] objection to proffered co-conspirators' testimony: that the declarant was not a co-conspirator; that the party against whom the statement is offered was not a co-conspirator; that the statement was not made 'in the course' of the conspiracy; that the statement was not made 'in furtherance of' the conspiracy." *United States v. Burton*, 126 F.3d 666, 673 (5th Cir. 1997) (addressing FRE 801(d)(2)(E)). All the record shows here is that Holmes objected—even, perhaps, moved to strike—based on hearsay. In response, the prosecution invoked the coconspirator exception to the hearsay rule. We do not know what Holmes argued to overcome the State's invocation of

NRS 51.035(3)(e), *see* 21 *Federal Practice and Procedure, supra*, § 5036.1, at 645 ("if in response to a hearsay objection, the opponent invokes a hearsay exception, the objector will probably have to explain to the judge why the exception does not apply in order to preserve the error for appeal" (interpreting FRE 103, the counterpart to NRS 47.040(1)(a))), nor as in *Burton*, 126 F.3d at 673, can we say whether Holmes objected that Reed's statement to Richardson was not "in the course" or "in furtherance" of the conspiracy. And unless the argument made on appeal appears in the record below, this court lacks a satisfactory basis for assessing prejudicial error. *See Fish v. State*, 92 Nev. 272, 276, 549 P.2d 338, 340-41 (1976) (objection on the grounds that a coconspirator's statements "were not made during the course or in furtherance of the conspiracy" was not adequately preserved by an objection to the adequacy of the proof of the conspiracy). Our review, therefore, is limited to plain error. *Burton*, 126 F.3d at 673-74; *see Fish*, 92 Nev. at 276, 549 P.2d at 341.

For error to be plain, the complained-of error must be "'so unmistakable that it reveals itself by a casual inspection of the record.'" *Saletta v. State*, 127 Nev. ___, ___, 254 P.3d 111, 114 (2011) (quoting *Patterson v. State*, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995)). Holmes argues that Reed's statements to Richardson about the shooting could not have been made "during the course and in furtherance of the conspiracy" because, by the time he spoke to Richardson, the robbery was over and Nelson was dead. But *Crew v. State*, 100 Nev. 38, 46, 675 P.2d 986, 991 (1984), holds that, under NRS 51.035(3)(e), "the duration of a conspiracy is not limited to the commission of the principal crime, but extends to affirmative acts of concealment." Thus, in *Crew*, we upheld admission of statements by a coconspirator about plans to move buried

bodies in case the party against whom the statements were admitted, who was being interviewed by the police at the time the statements were made, divulged the bodies' location to the police. This was deemed "in furtherance of the conspiracy to commit the crime and to 'get away with it.'" *Id.*; *see* 30B Michael H. Graham, *Federal Practice and Procedure* § 7025, at 289 (interim ed. 2011) ("Statements in furtherance of [a] conspiracy include statements made to . . . induce further participation, prompt further action, reassure members, allay concerns or fears, keep conspirators abreast of ongoing activities, [or] avoid detection," though "mere conversations or narrative declarations of past events are not in furtherance of the conspiracy.").

Richardson's conversation with Reed occurred less than two hours after the murder and robbery, while police and ambulance crews were still at the crime scene. It appears that Reed was updating Richardson, on whom both Reed and Holmes relied for advice and help, on the situation—though it can also be argued (it was not, at least not on the record we have) that Reed's remarks amounted to self-serving blame-shifting. We know that Reed and Holmes did not get the drugs and money they hoped for from Nelson and that Richardson gave Holmes money at the bus station so he could leave town hours after he talked to Reed. But with no record discussion of the "during the course and in furtherance of the conspiracy" requirements of NRS 51.035(3)(e) as they might apply to what Reed said to Richardson about the shooting, it is not possible to say whether the conversation was to "keep conspirators abreast of ongoing activities [or] avoid detection" (admissible) or "mere conversations or narrative declarations of past events" (inadmissible). Assuming objection, argument, perhaps an offer of proof, a ruling could legitimately have gone

SUPREME COURT
OF
NEVADA

(O) 1947A

either way. Given this record, an abuse of discretion amounting to plain error does not appear.[3]

### III.

Holmes argues that the district court should have suppressed the unwarned statement he made to the Nevada detectives who interviewed him at his California parole officer's office. This argument fails under *Howes v. Fields*, 565 U.S. \_\_\_, \_\_\_, 132 S. Ct. 1181, 1192-94 (2012), because the interrogation was not custodial, *see also Minnesota v. Murphy*, 465 U.S. 420, 431 (1984), and thus did not require a warning under *Miranda v. Arizona*, 384 U.S. 436 (1966). Also, the district court's finding of voluntariness was correct. *Rosky v. State*, 121 Nev. 184, 190, 111 P.3d 690, 694 (2005).

Holmes's remaining assignments of error also fail. The detectives testified about their investigation, not witness veracity, and as such, the district court had no reason to limit the scope of the testimony, *Cordova v. State*, 116 Nev. 664, 669-70, 6 P.3d 481, 484-85 (2000). Finally, the statements made in the prosecutor's closing argument do not warrant reversal because, while improper, they did not substantially affect the

---

[3]Holmes also argues that the admission of Reed's statement to Richardson violated his rights under the Confrontation Clause. This argument fails, since coconspirator statements to one another or even to a governmental informant are "nontestimonial statements that fall[ ] outside the requirements of the Confrontation Clause." *United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007) (citing and discussing *Crawford v. Washington*, 541 U.S. 36 (2004), and *Davis v. Washington*, 547 U.S. 813 (2006)).

jury's verdict. *Valdez v. State*, 124 Nev. 1172, 1188-89, 196 P.3d 465, 476 (2008).

Accordingly, we affirm.

_____, C.J.
Pickering

I concur:

_____, J.
Hardesty

SUPREME COURT
OF
NEVADA

(O) 1947A

SAITTA, J., dissenting:

I respectfully dissent. In my view, the district court abused its discretion in admitting the lyrics from Holmes' song "Drug Deala" because the lyrics were of limited, if any, probative value and their limited probative value was substantially outweighed by the danger of unfair prejudice. I further conclude that the error was not harmless and therefore I would reverse the judgment of conviction and remand for a new trial.

*Admission of the lyrics*

Relevant evidence is inadmissible when "its probative value is substantially outweighed by the danger of unfair prejudice." NRS 48.035(1). I suggest that the lyrics were not probative for two reasons: they are not clearly an admission rather than artistic expression, and they are not sufficiently specific as to be relevant to the charged crimes.

First, the lyrics appeared more a product of artistic expression consistent with the "gangsta rap" genre of music than an admission. "Gangsta rap" describes a variation of rap music that addresses gang culture, race conflict, and poverty. Leola Johnson, *Silencing Gangsta Rap: Class and Race Agendas in the Campaign Against Hardcore Rap Lyrics*, 3 Temp. Pol. & Civ. Rts. L. Rev. 25, 25 n.1 (1994). In an attempt to broaden the audience for early rap music, the recording industry exploited the fascination of the suburban middle class with inner-city life by promoting music that "afforded a glimpse into a dark world of violence, crime, poverty and death." Sean-Patrick Wilson, Comment, *Rap Sheets: The Constitutional and Societal Complications Arising from the Use of Rap Lyrics as Evidence at Criminal Trials*, 12 UCLA Ent. L. Rev. 345, 349-50 (2005). Companies responded to audience demand by promoting images

for signed artists that featured ever-increasing depictions of violence and criminal activity. *See id.* at 350-52. "As demand for more coarse lyrics grew, rappers were compelled to latch onto any negative image that would sell records." *Id.* at 353. Because the perception of an artist's authenticity was also correlative to commercial success, "[m]any rappers present[ed] themselves as gangsters, drug dealers, or pimps because it help[ed] sell." Jason E. Powell, Note, *R.A.P.: Rule Against Perps (Who Write Rhymes)*, 41 Rutgers L.J. 479, 516 (2009); *see* Andrea Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. & Arts 1, 16 (2007) ("Artists' images are constructed and marketed for maximal financial profit."). While many artists maintain that their lyrics accurately represent their lives, the depictions may be something from their past or whole or partial fabrications. Dennis, *supra*, at 17-19; *see also United States v. Foster*, 939 F.2d 445, 456 (7th Cir. 1991) (recognizing that rap lyrics may portray a fictional character). Therefore, even an amateur artist such as Holmes would feel compelled to mimic more successful artists. *See* Dennis, *supra*, at 17 ("Aspiring artists will model their more successful counterparts. It is fair to say that few in the rap industry want to be starving artists.").

The majority relies on the Sixth Circuit's decision, *United States v. Stuckey*, 253 F. App'x 468 (6th Cir. 2007), in which the federal district court admitted lyrics after observing, "[y]ou can certainly not say when somebody writes about killing snitches, that it doesn't make the fact that they may have killed a snitch more probable." *Id.* at 482 (internal quotations omitted). This reasoning is troublesome as it does not account for the nature of the artistic expression or of the market forces that act upon it. *See* Dennis, *supra*, at 17 ("One consequence of commercialization

is that artist images and lyrical narratives are not necessarily truthful—whether in whole or in part."). Violent imagery finds its way into lyrics because that is what the audience craves and the industry rewards, not necessarily because the artist has a propensity to engage in the acts depicted. As the premise upon which the federal district court based its conclusion is mistaken, this court should not rely on the *Stuckey* court's decision to affirm that conclusion.

Second, the lyrics are not sufficiently specific as to suggest that the description contained therein was that of the charged crime. *See Brooks v. State*, 903 So. 2d 691, 699-700 (Miss. 2005) (concluding rap lyrics discussing murder with firearm not sufficiently probative to trial for murder conducted with a meat fork). Holmes was tried for a single robbery and murder in the parking lot of a recording studio and was alleged to have stolen a necklace and rifled through the victim's pockets. Conversely, the lyrics seemingly describe two robberies: the theft of a necklace in a night club and a masked robbery in a parking lot. In neither robbery do the lyrics reference any sort of shooting. While both of the described robberies share similarities with the charged crime, they also describe rather routine criminal behavior that is frequent fodder for rap lyrics. *See, e.g.*, 2BRoy, *Parking Lot Jacking, on* Belizean Girl (Jah Bless Music & Films 2011) (describing assailant robbing club patrons of jewelry and other property in parking lot); Ya Boy, *Robbery, on* The Best of #1 (Indie Music Group 2010), *lyrics available at* http://www.cloudlyrics.com/ ya-boy-lyrics-robbery.html (describing armed robberies by a masked assailant where jewelry and other property taken); 50 Cent, *Ski Mask Way, on* The Massacre (Shady Records/Aftermath Records/

Interscope Records 2005), *lyrics available at* http://rapgenius.com/
50-cent-ski-mask-way-lyrics (similar).

As the lyrics were not appreciably probative, any unfair prejudice would render them inadmissible. Gangsta rap lyrics are prone to unfairly prejudice the defendant in the eyes of the jury, *see* Powell, *supra*, at 517 ("Part of rap's charm is its ability to produce discomfort."), and several courts have made note of how coarse and violent lyrics may prejudice a defendant, *United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011) (recognizing rap video was very prejudicial because it contained "violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle"), *cert. denied*, 565 U.S. ___, ___, 132 S. Ct. 826, 826 (2011); *Boyd v. City & County of San Francisco*, 576 F.3d 938, 949 (9th Cir. 2009) (recognizing that lyrics advocating prostitution were unfairly prejudicial); *State v. Cheeseboro*, 552 S.E.2d 300, 313 (S.C. 2001) (holding that admission of lyrics was unfairly prejudicial as they included only a vague reference to the criminal acts at issue but otherwise described the defendant's propensity for violence). In a study conducted by Dr. Stuart Fischoff, participants found a hypothetical defendant who wrote gangsta rap lyrics more likely to have committed murder than a hypothetical defendant who did not write such lyrics. Wilson, *supra*, at 371-73. The study further revealed "that potential jurors were 'significantly inclined' to judge a gangsta rap lyricist *not* accused of murder more harshly and with more disdain than a non-gangsta rapper who *was* accused of murder." *Id.* The study findings indicate that the music industry has been successful in marketing rap artists as criminals. As the industry and its artists translate this appearance of authenticity into record sales, they have no financial

interest in debunking this myth. The reactions reflected in the Fischoff study demonstrate the kind of unfair prejudice that may result from consideration of rap lyrics. *See State v. Eighth Judicial Dist. Court (Armstrong)*, 127 Nev. ___, ___, 267 P.3d 777, 781 (2011) (explaining that unfair prejudice includes decisions based on improper grounds, such as emotion, bias, sympathy, anger, or shock, rather than proof specific to the charged offense).

The *Stuckey* court overlooked this potential for unfair prejudice from the admission of rap lyrics. In affirming the failure to give a limiting instruction for the admission of the lyrics, the court observed that "[r]ap is no longer an underground phenomenon and is a mainstream music genre. Reasonable jurors would be unlikely to reason that a rapper is violent simply because he raps about violence." *Stuckey*, 253 F. App'x at 484. The court failed to consider that much of the public, even the district court judge who observed that Stuckey's lyrics demonstrated that it was more likely that he engaged in the behavior described, *see id.* at 482, is not aware of lore that the recording industry perpetuates in marketing its artists, *see* Dennis, *supra*, at 13 ("Despite the present-day ubiquity and popularity of rap music, the existence and use of methods governing the composition of lyrics are not part of the public's everyday learning and experience."); Wilson, *supra*, at 352 ("Whatever ties existed between rap music and the real inner-city, suburban America perceived them as gospel truths."). In light of its failure to fully appreciate the potential for unfair prejudice in the admission of such lyrics, this court should not rely on the *Stuckey* decision.

I conclude that although the district court made a thorough evaluation of and gave careful consideration to the admission of the lyrics

here, the court nonetheless abused its discretion in admitting the rap lyrics at trial. The lyrics were not sufficiently probative as the crimes depicted in the lyrics were dissimilar from the crime alleged. The lyrics did not reflect knowledge of the specific event any more than they describe routine criminal behavior. Moreover, the scant probative value of the lyrics was far outweighed by the danger of unfair prejudice that they presented.

*Harmless error*

I further conclude that admitting the lyrics was not harmless. *See Fields v. State*, 125 Nev. 776, 784-85, 220 P.3d 724, 729 (2009) (reviewing erroneous admission of evidence for harmless error). In considering whether the erroneous admission of evidence had a "'substantial and injurious effect or influence in determining the jury's verdict,'" *Tavares v. State*, 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), this court considers "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Big Pond v. State*, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985). This case is impacted heavily by two of the factors. The character of the error was significantly damaging. As noted in the Fischoff study, an individual who writes violent rap songs is viewed with more distaste than an accused murderer who did not write violent rap songs. While the question of guilt or innocence is not exceptionally close in this case, the purported confession in the form of a disparaged and often misunderstood form of expression likely had a significant impact on the jury's determination of

guilt. Lastly, Holmes was charged with first-degree murder with the use of a deadly weapon, which exposed him to two possible consecutive life sentences, and robbery with the use of a deadly weapon, which exposed him to two possible consecutive sentences of 15 years. *See* 2003 Nev. Stat., ch. 470, § 4, at 2944-45 (NRS 200.030(4)(b)); 2003 Nev. Stat., ch. 137, § 7, at 770-71 (NRS 200.030(4)(b)); NRS 200.380(2); 1995 Nev. Stat., ch. 455, § 1, at 1431 (NRS 193.165).

Accordingly, I would reverse the judgment of conviction and remand for a new trial.

_____, J.
Saitta