Saitta, J.,
dissenting:
I respectfully dissent. In my view, the district court abused its discretion in admitting the lyrics from Holmes’ song “Drug Deala” because the lyrics were of limited, if any, probative value and their limited probative value was substantially outweighed by the danger of unfair prejudice. I further conclude that the error was not harmless and therefore I would reverse the judgment of conviction and remand for a new trial.

*580
Admission of the lyrics

Relevant evidence is inadmissible when “its probative value is substantially outweighed by the danger of unfair prejudice.” NRS 48.035(1). I suggest that the lyrics were not probative for two reasons: they are not clearly an admission rather than artistic expression, and they are not sufficiently specific as to be relevant to the charged crimes.
First, the lyrics appeared more a product of artistic expression consistent with the “gangsta rap” genre of music than an admission. “Gangsta rap” describes a variation of rap music that addresses gang culture, race conflict, and poverty. Leola Johnson, Silencing Gangsta Rap: Class and Race Agendas in the Campaign Against Hardcore Rap Lyrics, 3 Temp. Pol. & Civ. Rts. L. Rev. 25, 25 n.l (1994). In an attempt to broaden the audience for early rap music, the recording industry exploited the fascination of the suburban middle class with inner-city life by promoting music that “afforded a glimpse into a dark world of violence, crime, poverty and death.” Sean-Patrick Wilson, Comment, Rap Sheets: The Constitutional and Societal Complications Arising from the Use of Rap Lyrics as Evidence at Criminal Trials, 12 UCLA Ent. L. Rev. 345, 349-50 (2005). Companies responded to audience demand by promoting images for signed artists that featured ever-increasing depictions of violence and criminal activity. See id. at 350-52. “As demand for more coarse lyrics grew, rappers were compelled to latch onto any negative image that would sell records.” Id. at 353. Because the perception of an artist’s authenticity was also correlative to commercial success, “[m]any rappers presented] themselves as gangsters, drug dealers, or pimps because it help[ed] sell.” Jason E. Powell, Note, R.A.P.: Rule Against Perps (Who Write Rhymes), 41 Rutgers L.J. 479, 516 (2009); see Andrea Dennis, Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1, 16 (2007) (“Artists’ images are constructed and marketed for maximal financial profit.”). While many artists maintain that their lyrics accurately represent their lives, the depictions may be something from their past or whole or partial fabrications. Dennis, supra, at 17-19; see also United States v. Foster, 939 F.2d 445, 456 (7th Cir. 1991) (recognizing that rap lyrics may portray a fictional character). Therefore, even an amateur artist such as Holmes would feel compelled to mimic more successful artists. See Dennis, supra, at 17 (“Aspiring artists will model their more successful counterparts. It is fair to say that few in the rap industry want to be starving artists.”).
The majority relies on the Sixth Circuit’s decision, United States v. Stuckey, 253 F. App’x 468 (6th Cir. 2007), in which the federal *581 district court admitted lyrics after observing, “[y]ou can certainly not say when somebody writes about killing snitches, that it doesn’t make the fact that they may have killed a snitch more probable.” Id. at 482 (internal quotations omitted). This reasoning is troublesome as it does not account for the nature of the artistic expression or of the market forces that act upon it. See Dennis, supra, at 17 (“One consequence of commercialization is that artist images and lyrical narratives are not necessarily truthful—whether in whole or in part.”). Violent imagery finds its way into lyrics because that is what the audience craves and the industry rewards, not necessarily because the artist has a propensity to engage in the acts depicted. As the premise upon which the federal district court based its conclusion is mistaken, this court should not rely on the Stuckey court’s decision to affirm that conclusion.
Second, the lyrics are not sufficiently specific as to suggest that the description contained therein was that of the charged crime. See Brooks v. State, 903 So. 2d 691, 699-700 (Miss. 2005) (concluding rap lyrics discussing murder with firearm not sufficiently probative to trial for murder conducted with a meat fork). Holmes was tried for a single robbery and murder in the parking lot of a recording studio and was alleged to have stolen a necklace and rifled through the victim’s pockets. Conversely, the lyrics seemingly describe two robberies: the theft of a necklace in a night club and a masked robbery in a parking lot. In neither robbery do the lyrics reference any sort of shooting. While both of the described robberies share similarities with the charged crime, they also describe rather routine criminal behavior that is frequent fodder for rap lyrics. See, e.g., 2BRoy, Parking Lot Jacking, on Belizean Girl (Jah Bless Music & Films 2011) (describing assailant robbing club patrons of jewelry and other property in parking lot); Ya Boy, Robbery, on The Best of #1 (Indie Music Group 2010), lyrics available at http://www.cloudlyrics.com/ya-boy-lyrics-robbery.html (describing armed robberies by a masked assailant where jewelry and other property taken); 50 Cent, Ski Mask Way, on The Massacre (Shady Records/Aftermath Records/Interscope Records 2005), lyrics available at http://rapgenius.com/50-cent-ski-mask-way-lyrics (similar).
As the lyrics were not appreciably probative, any unfair prejudice would render them inadmissible. Gangsta rap lyrics are prone to unfairly prejudice the defendant in the eyes of the jury, see Powell, supra, at 517 (“Part of rap’s charm is its ability to produce discomfort.”), and several courts have made note of how coarse and violent lyrics may prejudice a defendant, United States v. Gamory, 635 F.3d 480, 493 (11th Cir.) (recognizing rap video was very prejudicial because it contained “violence, profanity, sex, *582 promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle”), cert. denied, 132 S. Ct. 826, 826 (2011); Boyd v. City & County of San Francisco, 576 F.3d 938, 949 (9th Cir. 2009) (recognizing that lyrics advocating prostitution were unfairly prejudicial); State v. Cheeseboro, 552 S.E.2d 300, 313 (S.C. 2001) (holding that admission of lyrics was unfairly prejudicial as they included only a vague reference to the criminal acts at issue but otherwise described the defendant’s propensity for violence). In a study conducted by Dr. Stuart Fischoff, participants found a hypothetical defendant who wrote gangsta rap lyrics more likely to have committed murder than a hypothetical defendant who did not write such lyrics. Wilson, supra, at 371-73. The study further revealed “that potential jurors were ‘significantly inclined’ to judge a gangsta rap lyricist not accused of murder more harshly and with more disdain than a non-gangsta rapper who was accused of murder.” Id. The study findings indicate that the music industry has been successful in marketing rap artists as criminals. As the industry and its artists translate this appearance of authenticity into record sales, they have no financial interest in debunking this myth. The reactions reflected in the Fischoff study demonstrate the kind of unfair prejudice that may result from consideration of rap lyrics. See State v. Eighth Judicial Dist. Court (Armstrong), 127 Nev. 927, 933, 267 P.3d 777, 781 (2011) (explaining that unfair prejudice includes decisions based on improper grounds, such as emotion, bias, sympathy, anger, or shock, rather than proof specific to the charged offense).
The Stuckey court overlooked this potential for unfair prejudice from the admission of rap lyrics. In affirming the failure to give a limiting instruction for the admission of the lyrics, the court observed that “[r]ap is no longer an underground phenomenon and is a mainstream music genre. Reasonable jurors would be unlikely to reason that a rapper is violent simply because he raps about violence.” Stuckey, 253 F. App’x at 484. The court failed to consider that much of the public, even the district court judge who observed that Stuckey’s lyrics demonstrated that it was more likely that he engaged in the behavior described, see id. at 482, is not aware of lore that the recording industry perpetuates in marketing its artists, see Dennis, supra, at 13 (“Despite the present-day ubiquity and popularity of rap music, the existence and use of methods governing the composition of lyrics are not part of the public’s everyday learning and experience.”); Wilson, supra, at 352 (“Whatever ties existed between rap music and the real inner-city, suburban America perceived them as gospel truths.”). In light of its failure to fully appreciate the potential for unfair prejudice in the admission of such lyrics, this court should not rely on the Stuckey decision.
*583 I conclude that although the district court made a thorough evaluation of and gave careful consideration to the admission of the lyrics here, the court nonetheless abused its discretion in admitting the rap lyrics at trial. The lyrics were not sufficiently probative as the crimes depicted in the lyrics were dissimilar from the crime alleged. The lyrics did not reflect knowledge of the specific event any more than they describe routine criminal behavior. Moreover, the scant probative value of the lyrics was far outweighed by the danger of unfair prejudice that they presented.

Harmless error

I further conclude that admitting the lyrics was not harmless. See Fields v. State, 125 Nev. 776, 784-85, 220 P.3d 724, 729 (2009) (reviewing erroneous admission of evidence for harmless error). In considering whether the erroneous admission of evidence had a “ ‘substantial and injurious effect or influence in determining the jury’s verdict,’ ” Tavares v. State, 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)), this court considers “whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged.” Big Pond v. State, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985). This case is impacted heavily by two of the factors. The character of the error was significantly damaging. As noted in the Fischoff study, an individual who writes violent rap songs is viewed with more distaste than an accused murderer who did not write violent rap songs. While the question of guilt or innocence is not exceptionally close in this case, the purported confession in the form of a disparaged and often misunderstood form of expression likely had a significant impact on the jury’s determination of guilt. Lastly, Holmes was charged with first-degree murder with the use of a deadly weapon, which exposed him to two possible consecutive life sentences, and robbery with the use of a deadly weapon, which exposed him to two possible consecutive sentences of 15 years. See 2003 Nev. Stat., ch. 470, § 4, at 2944-45 (NRS 200.030(4)(b)); 2003 Nev. Stat., ch. 137, § 7, at 770-71 (NRS 200.030(4)(b)); NRS 200.380(2); 1995 Nev. Stat., ch. 455, § 1, at 1431 (NRS 193.165).
Accordingly, I would reverse the judgment of conviction and remand for a new trial.